WASHINGTON GAS LIGHT CO. v.
BYRNES, Director of Economic
Stabilization.

PUBLIC UTILITIES COMMISSION OF
THE DISTRICT OF COLUMBIA v.
SAME.

WASHINGTON GAS LIGHT CO. v. BROWN,
Adm'r, Office of Price Administration.

PUBLIC UTILITIES COMMISSION OF
THE DISTRICT OF COLUMBIA
v. SAME.

Nos. 8501–8504.

United States Court of Appeals for the
District of Columbia.

Reargued June 4, 1943.

Decided July 26, 1943.

mond B. Keech, Corporation Counsel, D. C., and Vernon E. West, Principal Assistant Corporation Counsel, D. C., both of Washington, D. C., were on the brief, for appellant in Nos. 8502 and 8504.

Messrs. Harry R. Booth, Utilities Counsel, Office of Price Administration, and David F. Cavers, Assistant General Counsel, both of Washington, D. C., with whom Messrs. George J. Burke, General Counsel, W. Russell Gorman, and Howard S. Gutman, all of Washington, D. C., were on the brief for the appellee in each case, and appeared by authority of the Price Administrator.*

Before GRONER, Chief Justice, SOPER, Circuit Judge sitting by designation, and MILLER, Associate Justice.

SOPER, Circuit Judge.

These appeals are brought to test the validity of an increase in gas rates in the District of Columbia authorized by the Public Utilities Commission of the District but objected to by the Director of Economic Stabilization and his representative in this matter, the Administrator of the Office of Price Administration.

On October 13, 1942 the Public Utilities Commission, one Commissioner dissenting, issued an order whereby an increase of the rates and charges of Washington Gas Light Company for the twelve month period beginning September 1, 1942 was authorized. The order was passed in a proceeding instituted by the Commission on March 20, 1942 for the purpose of adjusting the rate of the company in conformity with a sliding scale arrangement established by the order of the Commission on December 13, 1935 under the Public Utilities Act of the District of Columbia, Section 43—317, D.C.Code, 1940. The Commission then found the rate base as of June 30, 1935, exclusive of working capital, to be $21,000,000 and the fair rate of return to be 6½ per cent. Under the sliding scale plan the accounts of the company have been audited by the Commission annually since 1935 and the rate base has been kept up to date by adding new property at cost and by deducting retired property; and the earnings of the company for each twelve month period ending June 30th have been ascertained so as to fix the rates for the ensuing year beginning on September 1st according to

Mr. E. Barrett Prettyman, of Washington, D. C., with whom Messrs. F. G. Awalt, Raymond Sparks, and C. Oscar Berry, all of Washington, D. C., were on the brief, for appellant in Nos. 8501 and 8503. Mr. Stoddard M. Stevens, Jr., of the Bar of the State of New York, of New York City, who was allowed to appear for appellant in Nos. 8501 and 8503, pro hac vice, by special leave of Court, was also on the brief.

Mr. Lloyd B. Harrison, Special Assistant Corporation Counsel, D. C., of Washington, D. C., with whom Messrs. Rich-

---

* Fed.Reg. 7910.

the formula that if the return for the preceding year was greater or less than 6½ per cent, the rates for the ensuing year would be decreased or increased in certain proportions. For example, if the return for the preceding year was between 5½ and 6 per cent, an increase would be made to raise the rate three-quarters of the way up to 6½ per cent.

In operation such a sliding scale plan gradually works towards a rate base valued at cost since additions to the property are recorded at cost; and in periods of continuously rising prices, such as have prevailed since 1935, the plan results in a rate base in each year of less than actual value at that time. In such a period the plan also produces less than the original rate of return fixed by the Commission because estimated expenses for the ensuing year are placed at the level of the year that has just past. In actual experience in the District of Columbia the plan has resulted in reductions in rates for each year in the intervening period, except in 1937 and in 1941 when no changes were made. The calculations made in August, 1942 showed that in the preceding test year the company had earned 4.87 per cent on the rate base. The Commission's accountants reported that under the sliding scale arrangement, disallowing all excess profits taxes, the company was entitled to an increase in rates of $326,000 while the figures presented by the company showed that it was entitled to an increase of $383,000. The order of the Commission authorized an increase of $201,424.74. In other words, the increase allowed was approximately $123,000 less than that indicated by the sliding scale. It is estimated that this increase will permit the company to make a net return of 5.58 per cent on the rate base.

The interest of the Director of Economic Stabilization and of the Administrator of the Office of Price Administration, referred to herein interchangeably as the Price Administrator, grows out of the possible inflationary effect of an increase of gas rates upon an increase of prices generally which Congress sought to check by the passage of the Emergency Price Control Act of 1942 approved January 30, 1942, 56 Stat. 23, 50 U.S.C.A. Appendix § 901 et seq. and the amendment thereof by the Inflation Control Act of October 2, 1942, 56 Stat. 765, 50 U.S.C.A. Appendix § 961 et seq. That the interest of the Price Administrator in this rate proceeding is legitimate was recognized by the Commission from the beginning, although § 302(c) (2) of the Price Control Act contains the express provision that "nothing in this Act shall be construed to authorize the regulation of * * * rates charged by any common carrier or other public utility". Counsel for the Price Administrator was present at the pre-trial conference on August 18, 1942 and throughout the subsequent hearings in August and September, and was given full opportunity to participate within the scope of the proceedings fixed by the Commission. The hearings came to a close on September 30, 1942 and, as we have seen, the Commission's decision and order were filed on October 13, 1942. In this order the Commission directed the attention of the company to the following provision contained in the Amendatory Act of October 2, 1942, which had been passed in the meantime: "The President may, except as otherwise provided in this Act, thereafter provide for making adjustments with respect to prices, wages, and salaries, to the extent that he finds necessary to aid in the effective prosecution of the war or to correct gross inequities: Provided, That no common carrier or other public utility shall make any general increase in its rates or charges which were in effect on September 15, 1942, unless it first gives thirty days notice to the President, or such agency as he may designate, and consents to the timely intervention by such agency before the Federal, State, or municipal authority having jurisdiction to consider such increase." 50 U.S.C.A. Appendix § 961.

By executive order promulgated on October 3, 1942, No. 9250, 50 U.S.C.A. Appendix § 901 note, under this quoted provision of the amendatory Act, 7 Fed. Reg. 7871, the President established the Director of Economic Stabilization and designated him as the agency to receive notice of any increase in public utility rates; and on October 14, 1942, the Director designated the Price Administrator as his representative in proceedings affecting utility rates. On October 14 the company gave the required thirty days notice of the proposed increase to the Price Administrator and he promptly made application that he be allowed to intervene in the proceeding and that the order of the Commission of October 13, 1942 increasing the rate be

vacated. The Commission, by order of October 23, 1942, reopened the case for the purpose of receiving from the Price Administrator additional evidence relating to the inflationary effect, if any, of the increase in rate previously authorized, and granted intervention for this purpose; and the formal consent of the company to the intervention was filed on October 30, 1942. Additional hearings were held on two days at which little change was made in the evidence, and on November 9, 1942 the Commission refused to vacate its order of October 13, 1942. Subsequently, petitions for reconsideration were filed on behalf of the Price Administrator and the Director, and these petitions were denied by the Commission on November 16, 1942. The result was that effect was then given to the order of October 13, 1942, increasing the rates for the twelve month period beginning September 1, 1942, which had been under reconsideration during the reopening of the proceedings. Both the Director and the Price Administrator appealed to the District Court under the provisions of Section 43—705 of the District Code, from the order of October 13, 1942, allowing the increase, and also from the order of October 23, 1942 reopening the proceedings for the limited purpose indicated. The District Court, after hearing, decreed that the order of the Commission be vacated but stayed its judgment pending appeal to this court, upon agreement of the Company to make proper refund to consumers if the decision should be affirmed. Subsequently it appeared that the certified copy of the proceedings before the Commission was not actually before the District Court at the time of its hearing and decision, as contemplated by Section 43—705 of the District Code, and thereupon a motion was filed by the Commission and the Company for a reconsideration of the court's decision, but this petition was denied. The appeals of the Director of Economic Stabilization and of the Price Administrator from both of the orders of the Commission constitute the subject matter now before this court.

■ Two contentions advanced by the opposing parties to this appeal will first be considered because they go to the form rather than the substance of the controversy and in our opinion are devoid of merit. On behalf of the Price Administrator it is contended that the judgment of the District Court should be sustained because the Commission's order of October 13, 1942 authorizing an increase in the rates was issued after the passage of the Act of October 2, 1942 without complying with the requirements of that Act for prior notice to the President's agency and consent on the part of the Utility to a timely intervention by the agency in the proceeding before the Commission. This recital of facts is correct as far as it goes but it takes no account of the notice served on the Price Administrator on October 14, 1942 or of the reopening of the case and the intervention of the Price Administrator and the opportunity afforded him to be heard during the period ending November 16, 1942 when the reopened proceedings came to an end and the Commission finally determined to stand by its order of October 13, 1942. The notice of October 14, 1942 was thus given thirty days before the final determination of the Commission. Moreover, the contention ignores the fact that the amendatory Act brought about no substantial change in the parties to the proceeding, since the Administrator of the Office of Price Administration, who was designated to represent the Director of Economic Stabilization after the passage of the amendatory Act, had been in the proceeding from the beginning and was represented both before and after the passage of the amendment by the same attorney. Everything that could be said by the Director of Economic Stabilization in opposition to the increase of rates had already been said by the Administrator of the Office of Price Administration throughout the proceeding and was reaffirmed after the intervention of the Director. In short, the contention does not go to the substance of the matter and the provisions of the amendatory Act requiring prior notice and consent to intervention by the Presidential agency were complied with.

■ On the other hand, a contention of the Commission and of the Company that the decree of the District Judge should be reversed because he did not have the record of the case before the Commission physically before him at the time of his decision is also without substantial merit. It is based upon Section 43—705 of the District Code that any appeal from a decision of the Commission shall be heard upon the record before the Commission, and that no new evidence shall be received. Reliance is also placed upon decisions

which hold that there is an absence of due process if the judgment of a court is not based upon a consideration of the record. Morgan v. United States, 298 U. S. 468, 56 S.Ct. 906, 80 L.Ed. 1288; Id., 304 U. S. 1, 58 S.Ct. 773, 999, 82 L.Ed. 1129. We think it is clear, however, that the material parts of the record were in effect brought to the attention of the District Judge at the time of the hearing and before his decision was rendered. There is in fact no contention that he was not substantially advised of the merits of the controversy from the briefs and arguments of counsel. Moreover, it appears that he made a close examination of the record when the motion to reconsider the decision was before him and found nothing therein to alter the opinion which he had already reached. Under these circumstances it is obvious that the objection is formal rather than substantial, and that no good purpose would be served by remanding the case to the District Judge for further consideration.

The important issue in the case turns upon the action of the Commission in confining the rate investigation to an application of the sliding scale to prevailing conditions and a consideration of the possible inflationary effect of a price increase, and in refusing a demand of the Price Administrator that a thorough going examination be made into the rate base, the rate of return, operation expenses and depreciation, and all other matters relative to the establishment of a fair return. The position of the Price Administrator is based in part on his interpretation of the price control statutes and in part upon his contention that he was denied the full rights of an intervenor to which he was entitled under the amendatory Act.

With respect to interpretation [1] the Price Administrator contends, on the

---

[1] The particular provisions of the Emergency Price Control Act of January 30, 1942, and of the Amendatory Act of October 2, 1942, which are interpreted herein, are as follows:

Act of January 30, 1942.

"Section 1. (a) It is hereby declared to be in the interest of the national defense and security and necessary to the effective prosecution of the present war, and the purposes of this Act are, to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices and rents; to eliminate and prevent profiteering, hoarding, manipulation, speculation, and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency; to assure that defense appropriations are not dissipated by excessive prices; to protect persons with relatively fixed and limited incomes, consumers, wage earners, investors, and persons dependent on life insurance, annuities, and pensions, from undue impairment of their standard of living; to prevent hardships to persons engaged in business, to schools, universities, and other institutions, and to the Federal, State, and local governments, which would result from abnormal increases in prices; to assist in securing adequate production of commodities and facilities; to prevent a post emergency collapse of values; to stabilize agricultural prices in the manner provided in section 3; and to permit voluntary cooperation between the Government and producers, processors, and others to accomplish the aforesaid purposes. * * *

"Section 2. (a) Whenever in the judgment of the Price Administrator (provided for in section 201) the price or prices of a commodity or commodities have arisen or threaten to rise to an extent or in a manner inconsistent with the purposes of this Act, he may by regulation or order establish such maximum price or maximum prices as in his judgment will be generally fair and equitable and will effectuate the purposes of this Act. So far as practicable, in establishing any maximum price, the Administrator shall ascertain and give due consideration to the prices prevailing between October 1 and October 15, 1941 * * * for the commodity or commodities included under such regulation or order, and shall make adjustments for such relevant factors as he may determine and deem to be of general applicability, including the following: Speculative fluctuations, general increases or decreases in costs of production, distribution, and transportation, and general increases or decreases in profits earned by sellers of the commodity or commodities, during and subsequent to the year ended October 1, 1941. * * *

"Section 302. (c) * * * Provided, That nothing in this Act shall be construed to authorize the regulation of (1) compensation paid by an employer to any of his employees, or (2) rates charged by any common carrier or other public utility * * *."

Act of October 2, 1942.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That in order to aid in the effective prosecution

strength of a clause contained in Section 1 of the amendatory Act, that the powers of the Commission to regulate utility rates in the District of Columbia was cut down and restricted by the amendment so that the Commission can now grant an increase in utility rates only to the extent that it finds it "necessary to aid in the effective prosecution of the war or to correct gross inequities". In deciding this question consideration of course must be given to the underlying salutary purpose of the original Act as shown in Section 1 "to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices and rents; to eliminate and prevent profiteering * * * to protect persons with relatively fixed and limited incomes, consumers, wage earners, investors * * * from undue impairment of their standard of living; * * * to assist in securing adequate production of commodities and facilities". It is also necessary to give proper weight to the cognate purpose of the amendatory Act as shown by Section 1 thereof to supplement and further effectuate the purpose of the original Act and to aid in the effective prosecution of the war by enlarging the power of the President and authorizing him to issue a general order "stabilizing prices, wages, and salaries, affecting the cost of living"; such stabilization "except as otherwise provided in this Act" to be as far as practicable "on the basis of the levels which existed on September 15, 1942".

The subsequent period was taken care of by giving the President power "except as otherwise provided in this Act" thereafter to "provide for making adjustments with respect to prices, wages, and salaries, to the extent that he finds necessary to aid in the effective prosecution of the war or to correct gross inequities". This grant of power is subject to the proviso that no public utility "shall make any general increase in its rates or charges which were in effect on September 15, 1942, unless it first gives thirty days notice to the President or such agency as he may designate, and consents to the timely intervention by such agency before the Federal, State, or municipal authority having jurisdiction to consider such increases".

The contention of the Price Administrator is that this section first gives the power to the President to stabilize all prices, including utility rates, on the levels existing on September 15, 1942, and then sets up a definite standard for subsequent adjustments; and that the proviso merely alters the method whereby increases in utility rates may be made, by taking the power away from the President and giving it to the Commission, but retains the standard which must be applied to all increases whether authorized by the President or the Commission. This construction, however, is seen to be strained and unnatural when all the relevant provisions of the original Act and of the amendatory Act are taken into consideration. In the

---

of the war, the President is authorized and directed, on or before November 1, 1942, to issue a general order stabilizing prices, wages, and salaries, affecting the cost of living; and, except as otherwise provided in this Act, such stabilization shall so far as practicable be on the basis of the levels which existed on September, 15, 1942. The President may, except as otherwise provided in this Act, thereafter provide for making adjustments with respect to prices, wages, and salaries, to the extent that he finds necessary to aid in the effective prosecution of the war or to correct gross inequities: Provided, That no common carrier or other public utility shall make any general increase in its rates or charges which were in effect on September 15, 1942, unless it first gives thirty days notice to the President, or such agency as he may designate, and consents to the timely intervention by such agency before the Federal, State, or municipal authority having jurisdiction to consider such increase.

"Sec. 2. The President may, from time to time, promulgate such regulations as may be necessary and proper to carry out any of the provisions of this Act; and may exercise any power or authority conferred upon him by this Act through such department, agency, or officer as he shall direct. The President may suspend the provisions of sections 3 (a) and 3 (c), and clause (1) of section 302(c), of the Emergency Price Control Act of 1942 to the extent that such sections are inconsistent with the provisions of this Act, but he may not under the authority of this Act suspend any other law or part thereof. * * *

"Sec. 7. (c) Nothing in this Act shall be construed to invalidate any provision of the Emergency Price Control Act of 1942 (except to the extent that such provisions are suspended under authority of section 2), or to invalidate any regulation, price schedule, or order issued or effective under such Act." 56 Stat. 765, 50 U.S.C.A.Appendix §§ 961, 962, 967(c).

first place, it is noteworthy that the standard specified in § 1 of the amendatory Act as the necessary basis for a price increase, that is, the furtherance of the war or correction of gross inequities, is set for the guidance of the President and not for the regulatory agencies. To find their governing standards recourse must be had to the statutes creating them and outlining their powers. Congress had in mind in passing the original Act that utility rates are subject in the District of Columbia and almost everywhere else to the control of regulatory bodies and are therefore not exposed to "speculative, unwarranted, and abnormal increases." Accordingly Congress provided in § 302(c) of the Act "that nothing in this Act shall be construed to authorize the regulation of (1) compensation paid by an employer to any of his employees, or (2) rates charged by any common carrier or other public utility, * * * ".

In contrast with this limitation is the power conferred upon the Price Administration by § 2(a) of the original Act to establish the maximum price of a commodity which has risen or threatens to rise to an extent inconsistent with the purposes of the Act, giving due consideration to the prices prevailing between October 1 and October 15, 1941, and the further power to make subsequent adjustments for relevant factors, including speculative fluctuations, general increases or decreases in cost of production, etc., during the year ending October 1, 1941. It is obvious that utility rates were excluded from the subject matter over which the Price Administrator was given broad powers of control in the original Act.

▇ It is equally clear that the power of regulatory bodies to fix utility rates was left unchanged by the amendatory Act except that the designated agency of the President was given the right to intervene and to be heard in any rate proceeding before any increase in rate in force on September 15, 1942 could be made effective. Power was given to the President to stabilize prices at the levels of September 15, 1942 "except as otherwise provided by this Act"; and power was also given him to make adjustments thereafter if he should find it necessary to expedite the war or correct inequities "except as otherwise provided in this Act". The other provisions, to which these exceptions relate, include Section 2 of the amendatory

Act wherein the President was given power to suspend the provisions of Section 3(a) and Section 3(c), and clause 1 of Section 302(c) but was denied authority to suspend any other law or part thereof. Also relevant to these exceptions is Section 7(c) which expressly provides that nothing in the Act shall be construed to invalidate any provision of the original Act except to the extent that such provisions may be suspended under the authority of Section 2. As we have seen, clause 302(c) of the original Act forbad the regulation of (1) compensation paid by an employer to his employees and (2) rates charged by any public utility. For our purposes it is especially significant that although the President was given power to nullify the prohibition against the regulation of wages contained in the original Act the power to nullify the prohibition in that Act against the regulation of utility rates was denied him.

▇▇ No room is left for the argument that the standard applicable to price regulation by the President after September 15, 1942 was also imposed upon regulatory commissions generally and upon the Public Utilities Commission of the District of Columbia in particular. If such had been the purpose of Congress there is no good reason why it failed to express it, especially as the powers of the Commission had already been fixed by Congress itself in the Public Utility Act of the District of Columbia, and repeals by implication are not favored. Even more persuasive is the proviso in Section 1 of the amendatory Act, which is the only part of the Act that expressly refers to public utilities and increases in rates over those in effect on September 15, 1942. This proviso clearly recognized the power of the Public Utilities Commission of the District of Columbia and other regulatory bodies to fix utility rates, and leaves this power undisturbed except that it imposes upon utilities seeking an increase the duty to give thirty days notice to the President's agency, and to consent to its timely intervention before any general increase in rate in effect on September 15, 1942 can be made in a rate proceeding. A corollary of this duty of the Utility is of course the duty of the regulatory body to accord the intervenor a fair hearing.

The legislative history of the amendatory Act of October 2, 1942 supports this

conclusion. When the bill was before the Senate, Senator Norris submitted an amendment which was adopted by the Senate that provided that rates charged by a public utility should not be increased without the consent of the President. But this amendment was rejected when the bill went into conference, and the proviso in § 1 of the Act as it now stands was substituted. When the conference report was returned to the Senate the subject was discussed at length by Senator Norris and certain interchanges took place between him and Senator Brown during the debate. The latter is party to the pending appeal in his capacity as Administrator of the Office of Price Administration. It clearly appears from their remarks that the senators understood that the opportunity afforded the President's representative to intervene in a rate hearing did not confer upon him the power to participate in the decision or to control the proceeding, but merely the right to show that an increase in rates would tend to increase the cost of living and thereby impair the stabilizing effect of the government's price regulation, with the right of appeal where the Commission's action is reviewable by the courts. In short, as Senator Norris expressed it, the Act conferred no technical relief but only a great moral effect which would flow from an unwarranted opposition of a regulatory commission to the efforts of the Price Administrator to check inflation. See 88 Cong. Rec. 155, 7443, 7877-8, 7901, 7971, 7973, et seq.

It will be perceived that this interpretation gives effect to the proviso in that it preserves the power of the regulatory body, while exposing it to the public appeal of a government official charged with the administration of an act of Congress designed to protect the welfare of the entire nation. The record in this case shows that the intervention of the Price Administrator was not without influence or effect. The Commission was not oblivious to the economic conditions consequent upon the war and did not disregard them in formulating its findings and opinion. It pointed out that its responsibilities were twofold, that is, to determine what increase, if any, the company was entitled to under the sliding scale for the ensuing year and also to give recognition to the existing economic situation and the ability of the company to finance needed plant extension and render adequate service to consumers at the nation's capital. The intervention and assistance of counsel for the Price Administrator were noted, and findings, supported by substantial evidence, were made to the following purport and effect:

The Commission's accountant computed that the company was entitled under the sliding scale to a rate increase of $324,-718.06, while the company's accountants computed that the increase should be $381,597. The difference between these amounts was caused by certain adjustments of operating expenses and taxes made by the Commission's accountant, which the Commission adopted. The Commission, however, did not allow even the full amount of the increase indicated by its accountant's calculation, but deducted the additional sum of $123,293.32, making the net increase $201,424.74. This result was accomplished (except for the deduction of one negligible item) by including accruals for federal income taxes at the rate of 31 per cent for the last six months of the test year ending June 30, 1942, instead of 40 per cent as provided by the sliding scale. On this point the Commission said:

"However, present-day conditions compel us to consider whether accruals for Federal income taxes at rates considerably higher than rates in effect in previous years should be allowed in their entirety for rate-making purposes. Much has been said recently regarding the allowance of Federal income taxes on a normal-year basis rather than on the basis prevailing in a so-called 'abnormal year.' Our difficulty here lies in the necessity for making a distinction between normal and abnormal taxes. It is true that rates of taxation imposed during the year 1941 and proposed for the year 1942 are substantially in excess of rates imposed in prior years. However, it requires very little imagination to foresee that the proposed rate for 1942, while such rate is abnormal as compared with the rates in effect in prior years, may well be a normal or even a subnormal rate for some years to come. After weighing all factors to the best of our ability, we conclude that for the purpose of determining the amount available for rate increase for the rate year beginning September 1, 1942, the calcula-

tion of Federal income taxes for the test year under consideration (July 1, 1941, through June 30, 1942) at the rate of 31% is reasonable. Such a calculation will result in a further decrease of $115,863.09 in adjusted operating expenses and will eliminate the adjustment of $4,929.39 to provide for increase in taxes under the provisions of Section 6 of the sliding scale arrangement.

"With respect to excess profits taxes, we are of the opinion that no increase in rates should be predicated upon the liability of a utility for excess profits taxes. For this reason we have disallowed as an operating expense for the test year ended June 30, 1942 the excess profits tax of $43,928.02, in order to prevent the direct inflationary effect which such allowance would invite.

"The record indicates that the Company will not be liable for excess profits tax for the year 1942.[2] * * *"

The Commission gave especial attention to the financial condition of the company and its need for additional capital. In this respect it said:

"There is still another and very important problem for consideration, namely the financial position of the Company and particularly its ability to secure capital economically for the purpose of extending its plant to meet the growing demands for gas service. We must weigh the necessity for an increase in rates against the broad problem of adequate service. Low rates are desirable only when coupled with adequate service, and such service cannot be rendered by the Company if it is unable to secure funds to provide the necessary additional facilities. The District of Columbia has been characterized as the No. 1 defense area of the United States, and it is vital that the Company be in a position at all times to provide adequate service.

"It is a matter of record that the Company recently attempted to sell 40,000 shares of $5.00 cumulative preferred stock, but was successful only to the extent of being able to sell 18,206 shares of this stock. This was due to a number of factors and a recitation of events and facts preceding and subsequent to the offering of this stock shows that the financial position of the Company merits our most serious consideration.

On January 17, 1941, the Company filed an application with this Commission for authority to increase its capitalization by 90,000 shares of $4.25 preferred stock. Due principally to the lack of a quorum on the Commission this application was not acted upon until March 26, 1942 (Order No. 2221). At that time, due to depressed market conditions, the Company was unable to sell this newly created stock and endeavored to sell 40,000 shares of its $5.00 cumulative preferred stock with the result heretofore stated. In approving the sale of the $5.00 stock the Commission considered, among other factors, the financial position of the Company as of December 31, 1941. At that time income deductions and preferred dividends were earned 1.88 times, and the earnings per share of common stock were $2.24. Our order was issued April 21, 1942, and income for the twelve months ended April 30, 1942, showed that income deductions and preferred dividend coverage had declined to 1.75 times, while earning per share of common had declined to $1.96. For the twelve months ended July 31, 1942, the former figure had declined to 1.67 times and the latter to $1.80. This decline in income is not due entirely to increased provision for Federal income taxes. Substantial increases in the cost of labor and material have occurred during the period under discussion, and such increases have been provided for only in part in the determination of the amount available for rate increase. Labor costs included in operating expenses for the test year under consideration exceed labor costs for the prior test year by more than $300,000, a part of which was attributable to the increased volume of business."

Finally, after careful consideration of all factors having a bearing on the case, including the credit position of the Company, the Commission reached the opinion that there should be an increase in rate of $201,424.74 under the sliding scale arrange-

---

[2] The Commission eliminated from operating expenses excess profits taxes paid by the company for the year 1941 although it recognized the equity of a contention of the company that it would not have been liable for these taxes if the Commission had been in a position to act promptly on its application for the issuance of additional preferred stock in 1941 to which reference is hereafter made.

ment. In respect to the potential inflationary influence of this increase the Commission said:

"This increase in rates will not restore the earnings of the Company to the level obtaining prior to the decline, nor is it the intent of the sliding scale arrangement to do so. It will, however, tend to arrest the decline and preserve the principles inherent in the sliding scale arrangement, on which, as heretofore stated, the credit position of the Company depends in large measure."

\* \* \* \*

"The new domestic rates will result in an average increase of $.03 per month per customer. Domestic customers using 2,500 cubic feet or less per month will sustain no increase. Space heating customers' monthly bills for the eight-month heating season will be increased an average of $.57 for all customers. The typical space heating customers' bills will be increased by $.72 per month for the eight-month heating season. The average increase for commercial and industrial customers will amount to $.46 per month. The total increase for all customers is 2.28% in excess of rates for the preceding year."

"The cost of gas constitutes but 1.17% of the average cost of living in Washington, according to statistics of the Labor Department, and based on the percentage increase for gas service just stated the cost of living index would be increased by only 1/37 of 1%. We cannot conceive that such an increase would have material inflationary tendencies."

■ Manifestly, the order of the Commission was issued only after a deliberate and careful study of the factors affecting the business of the utility in wartime Washington without a trace of hasty or arbitrary conduct on the Commission's part. The findings of such an administrative agency, where there is evidence to support them, may not be set aside by the courts; Swayne & Hoyt Ltd. v. United States, 300 U.S. 297, 304, 57 S.Ct. 478, 81 L.Ed. 659; Norfolk & Western Ry. Co. v. United States, 287 U. S. 134, 53 S.Ct. 52, 77 L.Ed. 218; American Telephone & Telegraph Company v. United States, 299 U. S. 232, 57 S.Ct. 170, 81 L.Ed. 142; and in this case the findings of the Commission in the application of the sliding scale are not seriously disputed. Indeed the Commission did not give the Utility

all the advantage to which the sliding scale entitled it. Thus, the Commission allowed accruals for income taxes at the rate of 31 per cent although the sliding scale provided for an allowance of 40 per cent; and this reduction cost the company $123,000 in revenue for the ensuing year. Moreover, substantial increases in the cost of labor and material, common to all kinds of business during the war, were compensated for only in part in determining the increase of rates allowed, so that it was held down to the sum of $200,000. The conservatism of this action is demonstrated by the finding of the Commission, based on convincing evidence, that the company could not finance its needs and install the extensions required to fill the demands of the "No. 1 Defense Area of the United States", unless the decline in earnings was arrested and the principles of the sliding scale arrangement, on which the credit position of the company depended, were preserved. Viewed from this standpoint, it becomes clear that the intervention of the Price Administrator was not in vain. Indeed it would be difficult to say that the Commission did not comply with the standard imposed by the amendatory Act upon the adjustment of prices other than utility rates, that the adjustment be found "necessary to aid in the effective prosecution of the war or to correct gross inequities". Certainly the risk of such inflation as might be expected to follow from an increase of 1/37 of 1 per cent in the cost of living in the District of Columbia was amply justified.

The principles of the sliding scale were the subject of careful consideration when it was proposed by the People's Counsel and accepted by the utility in 1935. Acceptance by the utility was necessary since the statute, District Code Section 43—306, required that the Commission value the property of a utility at its fair value and the sliding scale arrangement eventuates in the course of time in a cost valuation. Section 43—317 permits a public utility to adopt a sliding scale of rates and dividends, if it is found by the Commission to be reasonable and just. Such an arrangement involves the basic elements of rate making, including a rate base, a fair rate of return and a correct determination of revenues, expenses and depreciation; and in its operation, capital additions and retirements as well as revenues and expenses are subject to constant

supervision and control of the Commission.

In the case of the Washington Gas Light Company, as we have seen, the system has brought about a reduction in rates in each year since 1935, except 1937 and 1941 when no change was made. All additions to the property have been entered at cost, and in the period of rising prices the gap between the present value of the property and the rate base allowed under the scale has widened. Likewise, the estimated expenses based in each year on the expenses of the preceding year have proved too small, and the rate of return has fallen to 4.87 per cent instead of 6½ per cent allowed in 1935. Meanwhile, the benefit of economies has been transferred to the consuming public, and the accumulation of a cash reserve by the company to meet the growing demands of the community has been precluded. It was under these circumstances that the Commission held that the need for an, increase of rates was imperative, and that the sliding scale should be applied as it had been in previous years when it brought about a decrease in rates.

The District Judge in his consideration of the case found no fault with the propriety of the sliding scale or the manner in which it has heretofore been applied by the Commission; but he held that the scale should now give way in deference to the Congressional policy expressed in the Price Control Statutes. On this point he said: "The sliding scale arrangement is not a contract, certainly not one which binds the public. It must give way to public policy and to Congressional enactment which expresses that policy. The Commission in good faith has sought to fulfill its obligations under the sliding scale arrangement but may have lost sight of the check upon it which has been voiced by Congress. I am not unmindful that the effort and the cost in bringing about the sliding. scale arrangement was very great. I think it was the result of fair and honest judgment and has been found to be a good workable and economical plan, but it must now be subjected to a test not previously required."

In view of the new statutes the judge concluded that it had become the duty of the Commission, upon the request of the Price Administrator, to reconsider the basic principles of the sliding scale, and that when the Commission refused to undertake this task, its action was "arbitrary and illegal". As to the scope of the investigation demanded by the Price Administrator the judge said: "The Price Administrator claims that notwithstanding he was permitted to intervene the Commission nullified the permission by refusing to reconsider the basic principles of the sliding scale arrangement in the light of the economic conditions and the Government's program to prevent inflation. Appellants contend that by its rulings and pronouncements it limited its consideration to such data as would enable it to apply the formula of the sliding scale arrangement in determining what rates were authorized by the sliding scale arrangement."

There can be no doubt that the judge correctly stated the position of the Price Administrator as demanding a full and exhaustive examination into the rate base, the rate of return, the operating expenses and method of depreciation, and all other elements that usually enter into a utility rate investigation by a regulatory commission. In his brief in this court the Price Administrator said: " * * * It (the Commission) was under a legal duty to exercise the full measure of its statutory powers to prevent an increase in utility rates. It was, therefore, incumbent upon the Commission to reconsider all basic elements of the sliding-scale arrangement. Only by doing so could the Commission find whether the Company would be subjected to undue hardship if a rate increase was denied, or whether the increase was necessary to cure a gross inequity or to aid in the prosecution of the war."

During the course of the hearing before the Commission, there was much informal discussion and many subjects were touched upon; but the most precise and comprehensive statement of the attitude of the Price Administrator as to the scope of the investigation is contained in the following statement then made by his attorney:

" * * * We must be given the right to examine every issue which the courts have held enters into the making of fair and reasonable rate regardless of the terms of sliding-scale arrangement or previous conclusions by the Commission that a rate increase is justified. If we are to comply with applicable judicial principles affecting the question of fair and

558

reasonable rates, we must have the right to go into at least the following factors:

"(1) What is a proper rate base? And on that point an inquiry should be made and promptly as to why the rate base should not be predicated upon the original cost of the Company property. Why should the rate payers be compelled to pay increase rates upon a rate base largely in excess of the original cost of the Company's property?

"(2) What are fair operating expenses of the company? Here the question of depreciation expense is a serious problem as far as the public is concerned since accrued depreciation was not deducted from the rate base.

"(3) What are other proper operating expenses? Here the minority opinion by Commissioner Hankin must be given fair and adequate consideration.

"(4) What are proper income taxes to be allowed or should the Company's customers pay its war taxes?

"(5) What is a fair rate of return for this Company in the light of current economic conditions.

"It must be of course clear that a full and complete inquiry for the purpose of determining what are fair and reasonable rates, must be made in order that the Commission may comply with its duty under the law * * *".

In respect to each of these matters the Price Administrator asserted that the Company was receiving an undue advantage under the sliding scale. For example, he said that the rate base was overvalued and should be revalued at original cost; that even without adjustment on the basis of the sliding scale the Company would earn a return of 5 per cent in the ensuing year, which was sufficient under wartime conditions; that the method of computing retirement accruals contained in the sliding scale was more favorable to the Company than an annual allowance for depreciation such as was approved (for a business of limited life) by the Supreme Court in Federal Power Commission v. Natural Pipeline Co., 315 U. S. 575, 62 S.Ct. 736, 86 L.Ed. 1037; that the Commission should not consider the 31 per cent income tax of 1941 as a normal pre-war tax and permit the Company to deduct it as an operating expense; and that other expense allowances were excessive.

All of these matters were discussed at great length during the extended hearings before the Commission. They were offered as reasons which, taken together, required a complete rate investigation. Indeed all of the subjects were so tied together that no substantial change could be made in one without a survey of the entire field. The Price Administrator made no definite offer of proof in connection with these matters; indeed, he was in no position to do so, as he had not made the laborious calculations and studies that a thorough rate investigation necessarily entails. What he desired was an indefinite postponement of any increase in rates pending an exploratory investigation by the Commission in which he was willing to assist as best he could. As he said in his brief in this court: "In the proceeding before this Commission, OPA and OES sought to enlighten the members of the Commission as to this program and the need for wholehearted support of the Commission. We also sought to explore with the Commission the factors to be considered in determining what the Company's earnings have actually been and what they probably will be. We also sought to show that the change in economic conditions which had taken place since 1935, when the sliding-scale arrangement was made, required the Commission to take the appropriate steps to reconsider the arrangement."

In furtherance of this object the Price Administrator requested that the Commission undertake a revaluation of the Company's rate base by applying a method that is in conflict with the provisions of Section 43—306 of the District Code wherein it is provided that the Commission shall value the property of every public utility in the District at the fair value thereof at the time of the valuation. In disregard of this governing statute the Price Administrator makes the following statement in his brief in this court: "Nevertheless, appellees have not requested the making of a valuation of the property of appellees. The Government's view is that the rate base in utility rate cases is to be arrived at by taking the original cost or the prudent investment of the property with appropriate consideration for accrued depreciation. We have not sought a revaluation of the Company's property in the sense that it is necessary for the Commission or the Company to

make reproduction cost appraisals. All we have said is that it should be necessary in determining the need of the company for a rate increase for the Commission to determine whether it would be unfair to limit the Company's return to original cost with due consideration to the proper treatment of depreciation in line with the Supreme Court's decisions."

■ In its essence, the question raised in this aspect of the case is whether the Commission, as the regulatory body, or the Price Administrator, as intervenor, should control the scope of the investigation. We do not think that the mere right to intervene in a rate proceeding conferred upon the Price Administrator by the Act of October 2, 1942, includes the power to compel the regulatory body to undertake a complete rate investigation against its better judgment, much less an investigation upon lines contrary to the governing statute. The power and authority to fix reasonable, fair and just rates for utilities in the District of Columbia was conferred by Congress upon the Commission, District Code Section 43—401. To this end the Commission is empowered to make rules and regulations for the administration of the Act, for audits and investigations, and for the conduct of its own proceedings and hearings. Sections 43—202, 43—402. It may, in its discretion, proceed with or without notice upon its own initiative or upon reasonable complaint "to make such investigation as it may deem necessary or convenient". Section 43—408. The Act is carefully drawn in considerable detail and expressly provides that it shall be interpreted and construed liberally in order to accomplish the purposes thereof. Section 43—1003.

■ It is not reasonable to suppose that Congress intended to abrogate or repeal the powers so carefully elaborated by giving the Price Administrator the right to compel a complete overhauling of the established practice of the Commission and the adoption of a new and different standard, when experience had shown that the prevailing practice was adequate to secure the objective of adequate service with a fair rate of return on the utility's investment. The power to fix rates is a legislative power which has been delegated by Congress to the Commission and in its exercise within constitutional limits the discretion of the Commission may not be controlled even by the courts. The utility

itself cannot compel an investigation and a change of rate that is not confiscatory in the constitutional sense. Nor can the rate making body be confined to any particular standard or method in the field of its discretion. That which was said of the Federal Power Commission in Federal Power Comm'n. v. Natural Pipeline Co., 315 U. S. 575, 586, 62 S.Ct 736, 743, 86 L.Ed. 1037, is equally true of the Public Utilities Commission of the District of Columbia. The court said: "The Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas. Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. Once a fair hearing has been given, proper findings made and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped. If the Commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end."

It must be borne in mind that there was no refusal on the part of the Commission to receive evidence with regard to the inflationary effect of an increase of rates. On the contrary the Commission expressed a desire to hear the Price Administrator and urged him to present any evidence in his possession on this point. Moreover, the Commission gave heed to present day conditions by reducing the allowance which the sliding scale would have justified and at the same time ordered a small increase in rates in order to buttress the financial condition of the Company and enable it to satisfy the abnormal demands upon it. The conflict arose when the Price Administrator departed from the field committed to his care and demanded that the Commission suspend the application of the sliding scale, and reexamine its basis in a complete investigation of all the elements that enter into the determination of a utility rate by a regulatory body.

■ The investigation leading to the adoption of the sliding scale in 1935 required three and a half years for its completion and cost $750,000; and it is obvious that the kind of inquiry that the Price Administrator now demands could not be made without great expense of

time and money. Our conclusion is that the refusal of the Commission to undertake such an investigation at this time, and in the meantime to ignore the reasonable needs of the company, was not arbitrary or illegal, but was well within its lawful discretion.

The judgment of the District Court will be reversed and the cases remanded with instructions to dismiss the appeals from the Commission's orders.

Reversed and remanded.

MILLER, Associate Justice (dissenting).

I think the decree of the District Court should be affirmed. The decision of this case does not turn upon the power of courts to interfere with the findings and determinations of regulatory bodies, or upon the findings and determinations made by the Commission in the present case. The questions are (1) whether full intervention was permitted and a fair hearing given within the meaning of the applicable statute; (2) whether a rate increase was made contrary to the requirement of the statute.

Making full allowance for the fact that the Inflation Control Act of October 2, 1942,[1] represented a compromise between contending factions in Congress—as most legislation does—nevertheless some substantial purpose must have been intended to be served by inclusion therein of the provision "That no common carrier or other public utility *shall make any general increase* in its rates or charges which were in effect on September 15, 1942, unless it first gives thirty days notice to the President, or such agency as he may designate, and consents to the timely intervention by such agency before the Federal, State, or municipal authority having jurisdiction *to consider such increase*."[2] [Italics supplied]

In the first place, this proviso clearly defines the issue which is to be tried by the authority having jurisdiction of the case in which intervention is required, namely, whether or not the public utility "shall make any general increase in its rates." The issue is not whether an increase shall be made pursuant to an arrangement theretofore agreed upon, or upon notice theretofore given, or upon terms theretofore defined, or in such an investigation as may be deemed "necessary or convenient" by the authority. The issue is simply and plainly, *shall an increase be made.* The trial of no lesser issue, however arrived at, can satisfy the requirement of the statute. Limiting the Administrator's intervention to the application of a sliding-scale formula previously adopted, therefore, defeated the purpose of the Act.

It is the duty of courts in interpreting statutes to avoid absurd results. Whatever may have been said in explanation of an act, its plain language cannot be disregarded. To limit the effect of the present Act to "the right to show that an increase in rates would tend to increase the cost of living and thereby impair the stabilizing effect of the government's price regulation," would reduce it to an absurdity. It is a matter of common knowledge that increases in rates tend to increase the cost of living. The Commission might well be expected to take notice of the fact. Intervention and fair hearing would not be necessary to make such a showing. If no more had been intended by the Act it could have been so indicated therein without requirement of notice or intervention.

Neither is the only alternative to such a purposeless intervention, "the power to *participate in the decision* or to *control the proceeding*." It is reasonable to suppose that Congress intended an intervention of the usual character. Intervention in a trial court does not contemplate participation in the decision; neither does it give to the intervenor power to control the proceeding. But it does contemplate that the court may be required to try the issues contemplated by the applicable laws; it empowers an intervenor, just as any other party, to insist upon compliance with the law and to challenge, in an appellate court, the failure of the trial court to do so. No less was intended here.[3]

Considerable reliance is placed upon the provisions of the District Code defining the powers of the Commission. It is argued that experience has shown the

---

[1] 56 Stat. 765, 50 U.S.C.A.Appendix §§ 961 et seq.

[2] 56 Stat. 765, 50 U.S.C.A.Appendix § 961.

[3] Cf. Federal Communications Commission v. National Broadcasting Co., 63 S.Ct. 1035, 87 L.Ed. ——.

prevailing practices of the Commission to be adequate to secure proper service and a fair rate of return, hence that it is not reasonable to suppose Congress intended to limit the powers originally conferred upon the Commission; especially as repeal by implication is not favored. In Henderson v. Washington, Marlboro & Annapolis Motor Lines, Inc.,[4] this Court said, concerning the Inflation Control Act of October 2, 1942: "But, apart from all statutes existing prior to October 2, 1942, and all orders, rules and regulations made pursuant to those statutes, the Act of October 2, 1942, is conclusive of the issue presented for our decision. As it was enacted subsequent to the Interstate Commerce Act it supersedes that Act, to whatever extent may be necessary to achieve its own purposes. Its clearly expressed purpose was to stabilize prices, wages and salaries affecting the cost of living, upon the basis of the levels which existed on September 15, 1942." This language is equally applicable in the present case. On June 9, 1943, Judge Sibley, speaking for the Fifth Circuit Court of Appeals,[5] held that Section 265 of the Judicial Code [6] forbidding the grant of an injunction by a court of the United States to stay proceedings in a state court must be considered modified by the later provisions of the Emergency Price Control Act. The present case involves much less difficulty. The Commission is a creature of Congress; its powers are derived from legislation enacted by Congress; there is no question of policy to be surmounted, in interpreting the earlier statutes in such manner as to secure their conformance to the purposes of later acts. While repeals by implication are not favored, repeals by implication do occur. When, as here, a new law is designed to achieve a clear purpose, it must be respected; and inconsistent procedures, previously existing must be disregarded. Consequently the rules adopted by the Commission governing its procedure and the shaping of issues have no vitality as against the requirement of the Act of October 2, 1942, that intervention must be permitted, or against any legal implications which flow from that requirement. From then on, it is not a question of the Commission or the Price Administrator con-

trolling the proceedings. It is the *law* which controls the proceedings and if the Commission does not comply with the law, the Price Administrator's duty is to challenge its failure to comply; and ours to uphold the challenge.

Neither is it material to the decision of this case that the Commission *reduced the allowance* which the sliding scale would have justified. The important fact is that the Commission *allowed an increase of rates*. If that allowance was made without granting full intervention and a fair hearing within the meaning of the applicable statute then the action of the Commission was improper and the decision of the District Court should be affirmed. With all deference to the majority, there *was* a refusal by the Commission to permit full intervention and to receive evidence with regard to the inflationary effect of an increase in rates. Only to the extent that offered evidence assumed the validity and unimpeachability of the sliding-scale arrangement, would the Commission receive it. Upon the same theory the Commission denied the Administrator's request to examine the Company's books and records. And upon the same theory the Commission refused to permit inquiry concerning the validity of the basic assumptions of the sliding-scale arrangement.

An argument of convenience is made upon the theory that compliance with the Administrator's demand for intervention and hearing would have required "a complete rate investigation," "a survey of the entire field," "the laborious calculation and studies that a thorough rate investigation necessarily entailed," "a complete investigation of all the elements that enter into the determination of a utility rate by a regulatory body". Attention is called in this connection to the fact that the investigation leading to the adoption of the sliding scale in 1935 required three and a half years for its completion and cost $750,000. It is asserted that the kind of inquiry that the Administrator now demands could not be made without great expense of time and money. I do not so read the record. What the Administrator asked was merely a reconsideration of the *basic principles* of the sliding-scale arrangement in the light of present economic con-

---

[4] 132 F.2d 729, 732, cert. denied, 63 S. Ct. 854, 87 L.Ed. —.

[5] Henderson (Brown) v. Fleckinger, 5 Cir., 136 F.2d 381.

[6] 28 U.S.C.A. 379.

ditions and the Government's program to prevent inflation; namely, what is a proper rate base; what are fair and proper operating expenses; what account should be taken of depreciation; what are proper income taxes to be allowed; what is a fair rate of return for the Company in the light of current economic conditions? There was no suggestion that the great mass of information gathered prior to 1935 was not equally available for present purposes. There was no objection to the introduction by the Commission of other available material in its files, just as is done by the Interstate Commerce Commission and by other regulatory authorities.

It is significant in this respect that the Commission, itself, went back of the sliding-scale arrangement in its allowance of an increase of rates. If, as is contended, an inquiry into the basic principles of a sliding-scale arrangement necessarily requires a three year investigation, at a cost of $750,000, how does the Commission explain its disregard of the sliding-scale arrangement in allowing accruals for income taxes at the rate of 31 per cent, although the sliding scale provided for an allowance of 40 per cent? Some basic principle of the arrangement must have been violated by that action. In short, my conclusion is that this argument about a large scale, expensive, time-consuming investigation, was advanced by the Commission and supported by the Company as camouflage to hide their unwillingness to permit *any* inquiry which did not assume and admit the infallibility of the sliding-scale arrangement. And I conclude that, whatever the proper limits of inquiry may have been, the Commission fell far short of them in the present case. The Commission and the Company apparently assume that only two alternatives were open (1) to proceed as the Commission specified in its original order of March, or (2) to enlarge the proceeding to permit a complete reinvestigation of every element, of fact as well as of principle, involved in the original sliding-scale arrangement. There were, instead, at least two other alternatives, (1) to permit no increase in rates until the war is over, as a matter of policy; (2) to permit the

Price Administrator to present such evidence as he deemed proper [7] concerning any phase of the matter; then, in deciding the case, to use, if the Commission pleased, the records of the earlier investigation, the sliding-scale arrangement and other of its pertinent records, compiled by its experts—and properly introduced as evidence. This could probably have been easily done in the time which was actually consumed, at the hearing, in contending over the scope of the intervention and the issues to be tried. In any event, I agree with the District Court that: "The sliding scale arrangement is not a contract, certainly not one which binds the public. It must give way to public policy and to Congressional enactment which expresses that policy. * * * it must now be subjected to a test not previously required."

It is suggested that the increase in rates, granted by the Commission in the present case, is very small, both in total and in their effect upon individual consumers. It is argued also that utility rates are not exposed to "speculative, unwarranted and abnormal increases," hence that Congress did not intend to apply to the guidance of regulatory authorities the wartime standards of the Inflation Control Act. I cannot follow this reasoning. Because Congress chose to retain *regulation* in authorities already existing, rather than placing it in the hands of the President, cannot explain away the fact that such rates were brought within the compass of the Act. There is no reason why the *standards* applicable in the one case should be inapplicable in the other. So far as concerns the minimal character of the rate increases I am content to adopt the language of Judge Vinson in the case of Lincoln Savings Bank of Brooklyn v. Prentiss M. Brown,[8] when speaking for the United States Emergency Court of Appeals, concerning the contention that the Price Act contemplated regulation only of those commodities, the prices of which substantially affect the cost of living, he said: "It is true that an increase in complainant's prices, in and of itself, does not substantially affect living costs. Complainant's statement is correct,

---

[7] In the Henderson case, App.D.C., 132 F.2d 729, 732, we said: "* * * the new Act * * * permits timely intervention by the Price Administrator * * *

followed by such appropriate showing as he may wish to make."

[8] 137 F.2d 228.

so far as it goes, but it is deceptive in its intended inference that, for that reason, no purpose is served by the regulation of safe deposit rental rates. Accession to this type of reasoning would virtually destroy the effectiveness of the Act. Complainant's argument is applicable to thousands of commodities besides its own. Clearly, however, *the collective effect of so many increased prices could create the very chaotic condition that the Act was designed to prevent.* It is plain to us that there is compelling reason to restrain the complainant and others in its class from making their *individually inappreciable contributions* to what would result in a very appreciable total." [Italics supplied]

The Administrator suggests the following possible constructions of the proviso to the second sentence of Section 1 of the Inflation Control Act: (1) "And such regulatory authority, in determining whether to grant or deny the increase, may give such effect, if any, to the national stabilization program as it may deem appropriate;" (2) "And such regulatory authority, in determining whether to grant or deny the increase, shall give effect to the national stabilization program;" (3) "And such regulatory authority, in determining whether to grant or deny the increase, shall grant the increase only if, and to the extent, it finds the increase necessary to aid in the effective prosecution of the war or to correct gross inequities." I agree with the Administrator that the third suggested construction is correct. The monopoly character of public utilities; the absolute dependence of the people upon them for service; the complicated structure of their holdings and their financing; these and other similar considerations are the very ones which caused the development of great federal, state and local regulatory agencies. It is because such agencies are well equipped to supervise and regulate, that Congress decided to preserve their control, rather than to throw a greatly increased burden upon wartime, emergency agencies such as the Price Administrator. But that decision does not by any means require the conclusion that these regulatory agencies were not to consider the existence of a war emergency or apply the wartime standards which

are implicit in the Act of October 2, 1942. It was, undoubtedly, the duty of the Commission to consider the financial condition of the Company, its ability to serve the Washington area, and its ability to refinance itself. It is, also, undoubtedly the duty of the President, the Price Administrator and other appropriate governmental agencies to consider the financial condition of other industries, of agricultural interests, of wage earners and of men selected for military service. The exigencies of war make it necessary, however, to impose controls which would not be proper during peacetime.

When young men are giving their lives by thousands, when the normal economy has given way to the necessities of war, when industrial organizations, great and small, have been converted to war production or perhaps destroyed,[9] it seems to me that a curious lack of identification with our national emergency and our national effort is required, to continue speaking in terms of normal arrangements and peacetime formulae. It is true, as the history of this legislation shows, that it is a compromise. But the significant thing is that the disputed proviso was incorporated, at all, into the Act of October 2, 1942. If the intention of Congress had been to leave regulation of the utilities by existing agencies solely according to prewar standards, it was not necessary to say anything about them in this Act. Of course it is possible to find language in legislative history which will support either side of a bitterly contested issue upon which a compromise is finally reached. Perhaps each proponent and opponent hopes that when the courts come to interpret their compromise language, the interpretation will fall his way. As previously stated, however, our task is to read the Act in such manner as to avoid an absurd result and to give it meaning, in the light of its expressed over-all purpose. There can be no doubt of that purpose in the present case. It was certainly not the intention of the lawmakers to leave these regulatory bodies, or the utilities, free of concern for the wartime welfare of the Country, to do business "as usual" according to such sliding-scale arrangements, designed for peacetime, depression-

9 See for an example of such possibilities, Perkins v. Lukens Steel Co., 310 U. S. 113, 60 S.Ct. 869, 84 L.Ed. 1108, and Lukens Steel Co. v. Perkins, 70 App.D.C. 354, 107 F.2d 627.

564

ridden Washington, as are involved in the present case.

The Commission's order of October 13, 1942, specified that the new, increased rates became effective on *September 1, 1942,* under the terms of the sliding-scale arrangement. On October 14, the Company gave notice to the Price Administrator, but in that notice specified that the effective date of the increase was *September 1, 1942;* in its order of October 23, 1942, the Commission specified again that the effective date of the increased rates was *September 1, 1942,* and it permitted intervention for the receipt of evidence concerning the increase in rates authorized by its order of October 13, 1942; on October 30, 1942, the Company consented to intervention; in its order of November 9, 1942, the Commission recited that intervention had been permitted for the purpose of receiving evidence bearing on the increase authorized by its order of October 13; on November 16, 1942, it denied the Administrator's petition for reconsideration. On the record of the Commission, therefore, its order of October 13, 1942, still stands; the increase in rates is effective as of September 1, 1942. The Act provides that no increase in rates which were in effect on September 15, 1942, shall be made unless the utility, "*first* gives thirty days notice * * * and consents to the timely intervention. * * *" [Italics supplied] In my opinion the increase, made in this case, was in clear violation of the law, entirely apart from the merits of the case.

A study of the record, particularly as interpreted in the opinion of Commissioner Hankin, suggests that when the time comes to consider the case on the merits, some of the findings and conclusions of the Commission will not stand careful scrutiny. But those questions are not before us. The decree of the District Court is clearly correct, on questions of procedure alone, and should be affirmed.