WASHINGTON PUBLIC INTEREST
ORGANIZATION et al., Petitioners,

v.

PUBLIC SERVICE COMMISSION of the
District of Columbia, Respondent,

Washington Gas Light Company,
Intervenor.

PEOPLE'S COUNSEL, Petitioner,

v.

PUBLIC SERVICE COMMISSION of the
District of Columbia, Respondent,

Washington Gas Light Company,
Intervenor.

WASHINGTON PUBLIC INTEREST
ORGANIZATION et al., Petitioners,

v.

PUBLIC SERVICE COMMISSION of the
District of Columbia, Respondent,

Potomac Electric Power Company,
Intervenor.

Nos. 11780, 11786 and 12017.

District of Columbia Court of Appeals.

Argued Sept. 20, 1977.

Decided Sept. 12, 1978.

Gilbert Hahn, Jr., Washington, D. C., for petitioners in Nos. 11780 and 12017.

Elizabeth A. Noel, Washington, D. C., for petitioner in No. 11786.

Linus H. Deeny, Washington, D. C., for respondents in Nos. 11780 and 11786.

James T. McManus, Washington, D. C., with whom John R. Risher, Jr., Corporation Counsel, and James T. McManus, Principal Deputy Corp. Counsel, Washington, D. C., were on the brief, for respondent in No. 12017.

Paul H. Harrington, Washington, D. C., with whom Lawrence A. Gollomp, Washington, D. C., was on the brief, for intervenor in Nos. 11780 and 11786.

Allen C. Barringer, Richmond, Va., with whom Lewis Carroll, Birmingham, Ala., and Alan G. Kirk, II, Washington, D. C., were on the brief, for intervenor in No. 12017.

Before NEWMAN, Chief Judge, and NEBEKER and FERREN, Associate Judges.

FERREN, Associate Judge:

Petitioners, Washington Public Interest Organization (WPIO) and the People's Counsel, challenge the rate increases granted by the Public Service Commission of the District of Columbia (the Commission) to Potomac Electric Power Company (Pepco) and to Washington Gas Light Company (WGL) in October, 1976. Petitioners raise a single issue: when land no longer used in delivering service to the public is sold by a public utility company, should the financial gain—representing appreciation of the property while in service, i. e., while in the "rate base"—accrue to the company's shareholders or to its customers (in the form of reduced utility rates)?

The Commission ruled that the shareholders alone should benefit. Its decision rests primarily on the ground that allocation of appreciation on retired land to the shareholders conforms to the mandate of the standard accounting system for utility companies, i. e., the Uniform System of Accounts promulgated by the Federal Power Commission and adopted by our own Commission for use in the District of Columbia.

This simple rationale belies a complex inquiry. After stating the facts and procedural history (Part I) and taking account of our scope of review (Part II), we explore

(Part III.A.) the historical relationship between the uniform accounting system and ratemaking. After concluding, on the basis of a substantial body of case law, that the prescribed accounting treatment does not necessarily dictate a particular ratemaking result, we turn (Part III.B.) to the details of the uniform accounting system, in order to determine whether the Commission's per se reliance on it for ratemaking appears sound, even without an historical mandate. We conclude that the general principles of this accounting system, while intended to have ratemaking consequences, are subject to so many exceptions, and their application accordingly requires the exercise of so much Commission discretion, that the system itself is not selfjustifying as an automatic basis for a ratemaking decision. Finally, therefore, we consider (Part III.C.) the question whether application of the Uniform System of Accounts as the basis for ratemaking on the facts here can be said to pass muster. We conclude that the Commission has not supplied enough facts, coupled with detailed enough reasoning, to justify treatment of the land transactions solely by reference to the Uniform System. Our only available course, therefore, is to remand the proceedings for clarification.

## I. *Procedural History; Facts and Question Presented*

On December 29, 1975, Pepco filed an application with the Commission for a rate increase for retail electric service in the District of Columbia. As subsequently modified by Pepco, the requested increase would have totaled $57,578,000 annually. On October 20, 1976, after an eleven-day hearing in which WPIO, the People's Counsel, and four other parties participated as intervenors, the Commission issued a Proposed Opinion and Order (No. 5831) granting Pepco a 9.06% overall rate of return. This resulted in a total rate increase of $29,411,000 annually, amounting to slightly more than 50% of the increase requested. Subsequently, WPIO, the People's Counsel,

and two of the intervenors filed exceptions and applications for reconsideration, all of which the Commission denied. Petitioner WPIO has filed for review by this court (case No. 12017).

On September 30, 1975, WGL filed with the Commission an application for a retail gas rate increase of $7.5 million annually. WPIO and the People's Counsel intervened. After a hearing, the Commission on October 29, 1976, issued a Final Opinion and Order (No. 5833) granting WGL a rate of return of 9.25%, resulting in an annualized rate increase totaling $6.7 million, almost 90% of the amount requested. Applications for reconsideration by WPIO and the People's Counsel were denied, whereupon they filed petitions for review by this court (case Nos. 11780 and 11786, respectively).

We have consolidated these three petitions for review.

As to Pepco, the parties have stipulated that during the ten-year period 1965–74: (1) the company received a net gain of $542,179.22 (*i. e.,* "the difference between book value and sale price on the date of sale") from 103 transactions involving the "sale of land which at some prior date had been classified as having been devoted to public service"; and (2) the company transferred " 'below the line' or out of public service" 18 Sites for which the net gain (*i. e.,* "the difference between book value and market value on the date of transfer") was $182,390.33.[1] The parties also stipulated that of the total net gain of $724,569.55 from these sales and transfers, "$381,938.00 is allocable to Pepco's District of Columbia operations." Finally, the parties stipulated that in 1972, Pepco removed its 929 "E" Street, N.W. property "from [the] Utility Property [account] . . . as no longer used and useful." In this connection, they further stipulated that when Pepco sold the property in March, 1976, the net gain—the difference between market value and depreciated book value—was at least $468,-

---

1. The stipulations were agreed upon initially by WPIO and the utility companies, Pepco and WGL. The People's Counsel accepts the facts stipulated for purposes of their appeal in case No. 11786.

324.06, of which at least $207,139.73 was allocable to District of Columbia operations. Accordingly, the parties have stipulated that the total net gain allocable to District of Columbia operations for the Pepco properties at issue is at least $589,077.73.

As to WGL, the parties have stipulated that during the period January 1, 1965, to February 29, 1976, the company received a net gain, before taxes, of $6,343,270 from "12 transactions representing the sale of land and related improvements which at some prior date had been classified as having been devoted to public service." (The breakdown between depreciable improvements and non-depreciable land is provided only for certain Georgetown properties sold during the test year ending April 30, 1975).

Each case presents the question whether, in granting the particular rate increase, the Commission improperly failed to credit the customers—the ratepayers—with the stipulated gains received by Pepco and WGL, respectively, upon disposition of land removed from each company's utility service operation. This question arises, to put it most simply, as follows: In accordance with the Uniform System of Accounts prescribed by the Federal Power Commission (FPC) and adopted by the Public Service Commission of the District of Columbia, the gains and losses from dispositions of property owned by utility companies are allocated, depending on the circumstances, either to the customer-ratepayers (called "above the line" treatment) or to the investor-shareholders (described as "below the line"). See J. Suelflow, Public Utility Accounting: Theory and Application 23–24 (1973) (hereinafter "Suelflow"). According to this accounting system—and subject to notable exceptions—dispositions of land previously retired from active use in utility service are usually accounted for "below the line"; shareholders alone benefit—or lose—from each transaction through an increase or decrease in the corporate earned surplus account. Dispositions of retired depreciable plant facilities, on the other hand, are usually accounted for "above the line"; typically, the ratepayers stand to benefit—or lose—in the calculation of the rates they are required to pay. See Part III.B., infra.

The justification for such accounting principles, with their impact on utility rates, is generally based on the proposition that the ratepayers, who have been charged for depreciation of plant facilities, should be repaid with the gains, if any, upon eventual sale of those facilities. Because land is not depreciable, however, and the ratepayers accordingly have not been responsible for replenishing it, the gains, if any, on sales of retired land are left to the investor-owners. They are the ones, at least theoretically, who brought the land to the enterprise and, as a result, should benefit.

Necessary refinements of these general principles will be discussed in due course. Suffice it to say at this point that petitioners challenge the Commission's decision to apply the uniform accounting system here, such that the land dispositions receive "below the line" treatment. More particularly, WPIO has asked that gains accruing to Pepco on land retirements and dispositions during the ten-year period, 1965–74, be credited to ratepayers in at least the amount of the $589,000.00 allocable to District of Columbia operations (presumably less taxes), and that gains accruing to WGL over an eleven-year period, January 1, 1965, through February 29, 1976, be allocated to ratepayers in the amount of at least $6,343,-000, less taxes. (Presumably this figure, as in the Pepco case, should be reduced to reflect gains allocable to the District of Columbia.) The People's Counsel, however, asks for a credit of $2,976,217 to WGL ratepayers, limiting its request to after-tax gains during WGL's "test year" ending April 30, 1975.[2]

---

2. The "test year" or "test period" is a "span of time in the immediate past" used as the basis for making a forecast of the utility company's financial needs, i. e., for calculating its essential rate of return. *Telephone Users Ass'n v. Public Service Comm'n,* D.C.App., 304 A.2d 293, 297 (1973), *cert. denied,* 415 U.S. 934, 94 S.Ct. 1449, 39 L.Ed.2d 492 (1974). *See* J. Bonbright, Principles of Public Utility Rates, 150 n.7 (1961).

II. *Scope of Review*

A. *In General*

The Commission, not this court, has the responsibility for setting utility rates. D.C. Code 1973, §§ 43–301, –401, –411. To be lawful, however, these rates must be "reasonable, just, and nondiscriminatory." D.C. Code 1973, § 43–301. They are subject, accordingly, to judicial review.[3]

This court has "jurisdiction to hear and determine any appeal from an order or decision of the Commission." D.C.Code 1973, § 43–705. *See* D.C.Code 1973, § 11–722. Our review, however, is "limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary, or capricious." D.C.Code 1973, § 43–706. *See Apartment House Council of Metropolitan Washington v. Public Service Comm'n*, D.C. App., 332 A.2d 53 (1975); *Chesapeake & Potomac Telephone Co. v. Public Service Comm'n*, D.C.App., 330 A.2d 236 (1974); *Goodman v. Public Service Comm'n*, D.C. App., 309 A.2d 97 (1973); *Telephone Users Assn' v. Public Service Comm'n*, D.C.App., 304 A.2d 293 (1973), *cert. denied*, 415 U.S. 933, 934, 94 S.Ct. 1449, 39 L.Ed.2d 492 (1974).

■ These statutory criteria are akin to those governing the Federal Power Commission and its oversight by the federal courts. In that context, the Supreme Court has held that unless the overall effect of a rate is "unjust and unreasonable," the Commission's order should be approved, irrespective of "infirmities" in the methodology used to calculate it. *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944). *See Federal Power Comm'n v. Natural Gas Pipeline Co.*, 315 U.S. 575, 585–86, 62 S.Ct. 736, 86 L.Ed. 1037 (1942). It follows that a rate order, as "the product of expert judgment," is presumptively valid; it should be

upheld unless a petitioner makes a "convincing showing" that it fails to meet the statutory criteria. *Federal Power Comm'n v. Hope Natural Gas Co., supra*, 320 U.S. at 602, 64 S.Ct. 281. *See Apartment House Council of Metropolitan Washington v. Public Service Comm'n, supra*, 332 A.2d at 56.

■ Given the Commission's broad statutory authority, our own limited scope of review, the judicial emphasis on the reasonableness of the overall rate (irrespective of Commission methodology), and the petitioner's burden to make a "convincing showing" of unreasonableness, one might conclude that the Commission's authority is virtually plenary. Not so. While the reviewing court cannot mandate a particular rate, and can only set aside a rate order upon a "convincing showing" of unreasonableness, the court, when presented with a nonfrivolous petition for review, has a responsibility to hold the Commission accountable—through as many remands as necessary—for satisfying a burden all its own: to explain its actions fully and clearly. A utility rate cannot be deemed "reasonable" simply because an expert agency says it is. Independent of a petitioner's burden to show convincingly that a Commission-prescribed rate is unreasonable, the Commission—as we shall develop below—has the burden of showing fully and clearly why it has taken the particular ratemaking action. Absent such comprehensive explanation, judicial review of the Commission's substantive decisions cannot be completed and the rate order finally approved—or set aside.

■ There are two aspects of this elaboration required of the Commission: (1) announcement of the criteria governing the rate determination, and (2) explanation of how the particular rate order reflects application of these criteria to the facts of the case. More particularly, as to the first, any valid rate determination presupposes that the Commission has selected suitably pre-

---

**3.** This case does not concern allegations of discrimination against one or more classes of users under the rate schedule. *See Apartment House Council of Metropolitan Washington v.* *Public Service Comm'n*, D.C.App., 332 A.2d 53 (1975). Accordingly, we confine our discussion to an evaluation of whether the rates at issue are reasonable and just.

cise criteria by which "reasonableness" of the order can be judged.

> Although neither law nor economics has yet devised generally accepted standards for the evaluation of rate-making orders, it must, nonetheless, be obvious that *reviewing courts will require criteria more discriminating than justice and arbitrariness if they are sensibly to appraise the Commission's orders.* [*Permian Basin Area Rate Cases,* 390 U.S. 747, 790, 88 S.Ct. 1344, 1372, 20 L.Ed.2d 312 (1968) (footnote omitted; emphasis added).] [4]

This need for explicit criteria follows from the fact that in each case there will be a "zone of reasonableness," *Federal Power Comm'n v. Natural Gas Pipeline Co., supra,* 320 U.S. at 585, 64 S.Ct. 281, with boundaries which the Commission must define and apply. *See Washington Gas Light Co. v. Baker,* 88 U.S.App.D.C. 115, 119, 188 F.2d 11, 15 (1950), *cert. denied,* 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686, *appeal after remand,* 90 U.S.App.D.C. 98, 195 F.2d 29 (1951). From the investor standpoint, the lower boundary—the floor of that zone—has already been defined by the courts in constitutional terms and remains only to be applied in each case. "By long standing usage in the field of rate regulation, the 'lowest reasonable rate' is one which is not confiscatory in the constitutional sense." *Federal Power Comm'n v. Natural Gas Pipeline Co., supra* 315 U.S. at 585, 62 S.Ct. at 742. From the consumer standpoint, the upper boundary—the ceiling—is less well defined, although it is clear that "[t]he consumer interest cannot be disregarded in determining what is a 'just and reasonable' rate . . .," *id.* at 607, 62 S.Ct. at 753

(Black, Douglas, and Murphy, JJ., concurring), and the rate itself cannot be "exorbitant." *Washington Gas Light Co. v. Baker, supra,* 88 U.S.App.D.C. at 119, 188 F.2d at 15. Equitable factors from the ratepayer perspective, therefore, are equally a part of the just and reasonable rate calculus. *See Permian Basin Area Rate Cases, supra,* 390 U.S. at 791–92, 88 S.Ct. 1344; *Democratic Central Committee v. Washington Metropolitan Area Transit Comm'n,* 158 U.S.App. D.C. 7, 485 F.2d 786 (1973), *cert. denied,* 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974) ("*Democratic Central Committee I* "). In summary, the Commission's responsibility begins with development and announcement of criteria circumscribing the "zone of reasonableness."

Second, and of equal importance, the Commission has a duty to explain clearly how its criteria are satisfied by the rate order—how it arrived at the particular result. As the Supreme Court has noted:

> Judicial review of the Commission's orders will . . . function accurately and efficaciously only if the Commission indicates fully and carefully *the methods by which,* and the purposes for which, it has chosen to act . . .. [*Permian Basin Area Rate Cases, supra* 390 U.S. at 792, 88 S.Ct. at 1373, emphasis added.]

While it is true that a regulatory commission cannot be faulted for its methodology if the "total effect of the rate order cannot be said to be unjust and unreasonable," *Federal Power Comm'n v. Hope Natural Gas Co., supra,* 320 U.S. at 602, 64 S.Ct. at 288, it is also true that the methodology must be disclosed for the bearing it may

---

**4.** The Supreme Court has elaborated three "interrelated criteria" for judicial review which incorporate commission-type criteria for reasonableness:

> First, it must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the

> court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors. [*Permian Basin Area Rate Cases, supra* at 791–92, 88 S.Ct. at 1373.]

have on that overall judgment. Absent precise explanation of methodology as applied to the facts of the case, there is no way for a court to tell whether the Commission, however expert, has been arbitrary or unreasonable.

This Supreme Court emphasis on creation of reasonably precise ratemaking criteria, coupled with a duty to explain with clarity how the facts relate to each in support of the overall rate order, is inherent in the Commission's responsibilities under the District of Columbia Administrative Procedure Act ("DCAPA"), D.C.Code 1978 Supp., §§ 1–1501 *et seq.,* by which a rate order also must be tested.[5] This statute specifies the burden imposed on each party to an administrative proceeding, as well as the burden on the agency itself. More particularly, "the proponent of a rule or order shall have the burden of proof." § 1–1509(b). In the present case, therefore, Pepco and WGL have the burden, at the Commission level, of establishing that their proposed rate orders are just and reasonable, including the allocations of gains (and losses) on land transactions inherent in their proposed ratemaking methodology. Included in that burden is a responsibility to develop a record sufficiently complete to support a Commission order in their favor on any contested issue. In contrast, WPIO and People's Counsel have no formal burdens. To prevail, however, they must defeat the utility companies with evidence and/or argument on the land-gains issue. The Commission, as decision-maker, must evaluate all the presentations and then fashion the most just and reasonable order, including a determination of the land-gains issue. The Commission, however, cannot validly do so without furnishing detailed findings of fact and conclusions of law sufficient to demonstrate that the overall rate determination is "in accordance with the reliable, probative, and substantial evidence." D.C.Code 1978 Supp. § 1–1509(e). *Chesapeake & Potomac Tel. Co. v. Public Service Comm'n,* D.C. App., 339 A.2d 710, 714. *See Telephone Users Ass'n v. Public Service Comm'n of D.C., supra.*

This "substantial evidence" test is not directed solely at the quantity of evidentiary support for an administrative determination.[6] Equally important is the preceding language of § 1–1509(e), *"in accordance with . . . ."* [Emphasis added.] There "must be a *demonstration* in the findings of a 'rational connection between facts found and the choice made' [citation omitted]." *Brewington v. Bd. of App. and Rev.,* D.C. App., 299 A.2d 145, 147 (1973) (emphasis in original). *See Jameson's Liquors, Incorporated v. Alcoholic Bev. Cont. Bd.,* D.C.App., 384 A.2d 412, 418 (1978); *Kopff v. Alcoholic Bev. Cont. Bd.,* D.C.App., 381 A.2d 1372 (1977); *Dietrich v. Bd. of Zoning Adjustment,* D.C.App., 293 A.2d 470 (1972). Thus, as applied to ratemaking, there must be enough evidence, rationally related to the rate order (through clearly articulated criteria), to justify the Commission's decision.

The Commission's DCAPA obligation to justify its decisions on the basis of substantial evidence creates the possibility that a petitioner for judicial review of a Commission's rate order may fail to carry its burden to show convincingly that the Commission action is invalid; and yet the court cannot uphold the Commission itself because of its failure to satisfy the substantial evidence test. The Commission's failure may be attributable to the utility companies' own failure, as proponents of the order, to supply a sufficient quantity of evidence in support; or the Commission's fail-

---

5. We have held that the DCAPA applies to actions of the Commission, subject to provisions of the organic act setting forth our scope of review, D.C.Code 1973, §§ 11–722, 43–706, and requiring a petitioner to seek reconsideration by the Commission, D.C.Code 1973, § 43–704, prior to petitioning for judicial review. *Chesapeake & Potomac Tel. Co. v. Public Service Comm'n,* D.C.App., 339 A.2d 710, 713 n. 12, 714 (1975).

6. As to the quantity requirement, "substantial evidence" is " 'more than a mere scintilla' "; it is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Vestry of Grace Parish v. Alcoholic Bev. Cont. Bd.,* D.C.App., 366 A.2d 1110, 1112 (1976) (citation omitted).

ure may be due solely to its insufficient explanation of the reasonableness of the order. In either event, a remand will be necessary.

This possibility that neither petitioner nor Commission can prevail, for the time being, becomes clear when we focus more precisely on why courts remand administrative proceedings. In many cases, perhaps most, where a court remands after judicial review, the court can reach the merits because the agency has sufficiently articulated the reasons for its actions. When the court remands such a case, it holds that the action is substantively defective—is facially arbitrary or otherwise unsupported. In short, the petitioner prevails. In other cases, however, the court—in finding a lack of substantial evidence—does not reach the merits because the agency's articulation of its position is too cryptic. The petitioners for judicial review have carried their burden to the extent of convincing the court that their position is not frivolous—they may have a valid point—and that the agency has not marshalled substantial evidence in support of its decision; but they have not carried their ultimate burden of convincing the court that the agency action cannot be supported. The principal reason why such petitioners may succeed in meeting this threshold burden, but not the ultimate one, is that the agency has given them a fuzzy target—one not sufficiently in focus to shoot at with careful aim. *See D.C. Transit Systems, Inc. v. Washington Metropolitan Area Transit Comm'n,* 121 U.S.App.D.C. 375, 401–2, 350 F.2d 753, 779–80 (1965) (en banc) (Commission failed to provide "an adequate basis for knowing why it did what it did").

A ratemaking proceeding is perhaps the most likely candidate for this latter type of result upon judicial review. A petitioner's burden is especially heavy to upset a rate order on the merits; thus, a reviewing court must be cautious before overturning an expert agency's determination. On the other hand, because ratemaking is complicated and understandably prone to technical, often shorthand terminology, there is a substantial risk that agency action will be too conclusional—not elaborated enough—for a non-expert court confidently to review. A court, without insisting on more precise explanation, could simply be fooled into accepting arbitrary agency action by the mesmerizing influence of the confidently expressed language of experts.

The requirement that a petitioner make a "convincing showing" to prevail on judicial review is, therefore, wholly compatible with the DCAPA requirement that the Commission, to be upheld, must demonstrate support of its order by substantial evidence. These independent burdens in the ratemaking context are derived, respectively, from a petitioner's traditional burden at the level of judicial review and the Commission's statutory burden to provide sufficient evidence to support its decision. It would be wholly at odds with the concept of judicial review to close a rate case in the Commission's favor, upon an insufficient showing by a petitioner, when the Commission's own order, under the guise of expertise, may preclude effective attack by inadequately explaining what the Commission has done and why the evidence supports it.

In summary, whereas a Commission rate order cannot be set aside unless a petitioner makes a "convincing showing" that it is unreasonable, unjust, or discriminatory, D.C.Code 1973, § 43–301, the same rate order cannot be approved by the reviewing court, without remand for clarification unless—and until—the Commission has complied with the DCAPA by specifying its criteria for the order and clearly explaining, without material gaps, how its findings rationally support that determination. Perhaps paradoxically, therefore, the less equipped the court is to do the job of the agency, and thus the more deference the reviewing court must show to the agency's authority and expert judgment, the greater the agency's obligation is to explain exactly why it chooses to take a particular course of action. The broad scope of an agency's authority is the very reason why that agency is obliged to explain itself with precision. If such broad authority implied, to the contrary, that the agency need not explain

itself, or could do so in shortcut fashion, then judicial review would be a nullity. While our own authority to intrude on agency functions is therefore limited, our authority—and responsibility—to find out why an agency acts as it does is considerable.

B. *Review of an Element of the Rate Order*

While the ultimate issue, upon judicial review, is the overall effect of the rate order, this is not to say that our review must encompass all aspects of that order. In the present case, for example, the overall rate of return is not directly at issue. None of the petitioners questions the rate levels, as such, granted WGL and Pepco; all agree (or do not contest) that for District of Columbia operations WGL is entitled to a 9.25% overall rate of return each year, while Pepco is entitled annually to 9.06% overall. The narrow question, therefore, is whether a portion of each company's prescribed return should be deemed already paid by the realization of gain (or appreciation in value) on land no longer in service, entitling the customers to a short-term credit of some sort; or whether, instead, each company's return should be recoverable in full from charges to its customers. Thus, we are asked to limit our review to scrutiny of the Commission's expert judgment applied to but one of many elements of the ratemaking calculus.

While we can—and will—do so, we confront a possible problem of myopia. Assume that petitioners do reveal an apparent infirmity in the Commission's ratemaking here. How can we be sure that other aspects of the rate order do not compensate the class represented by petitioners for that infirmity, such that the overall effect of the order is just and reasonable? We note, for example, that a challenge to another aspect of the same 1976 Pepco rate order is pending before another division of this court, No. 12023; thus, we are not dealing with the only element of that order that could undergo revision, affecting the parties' respective positions.

Our only choice, realistically, is to assume that respondents, aware of the overall effect or "end result" test, *Permian Basin Area Rate Cases, supra,* 390 U.S. at 791, 88 S.Ct. 1344, will reveal any such compensating factor. It follows that petitioners would be obliged to refute the point as part of their burden to make a "convincing showing" of unreasonableness. In this case, however, it is fair to say that respondents have not proffered a compensating factor from Case No. 12023 or otherwise; thus, we can consider the record before us as the entire universe for review purposes, without concern that a vital portion of the rate proceeding transcript is missing or that we have not been provided with an additionally relevant interpretation of the data.

The logical extension of our position is this: whenever more than one petition for review of a Commission rate order is filed with this court, and the Commission or another party—in advocating the overall effect or "end result" test—concludes that the petitions should be consolidated to achieve the requisite perspective, the Commission or other party must assume the burden of filing a motion to that effect. It will be freely granted absent unusual circumstances. Without such consolidation, however, any division of the court will have to disregard the issues in the other pending case and evaluate the rate order with respect to the one or more elements presented.

We turn now to what the Commission has done—and why. We focus on the relationship between rate making and the Commission's prescribed accounting system for utility companies.

III. *The Uniform System of Accounts*

A. *Historical Relationship to Ratemaking*

The FPC initially promulgated uniform accounting systems in 1937 and 1940 for electric utility and natural gas companies, respectively. *See* Kripke, *A Case Study in the Relationship of Law and Accounting: Uniform Accounts 100.5 and 107,* 57 Harv.L.

Rev. 433, 435 (1944). It did so out of a concern about the difficulty of determining the true value of utility properties allowed to comprise the rate base. During the 1920s, a period of rapid turnover and consolidation of ownership, regulatory commissions were confronted by accelerating inflation of book costs as utility properties continually changed hands—sometimes at arm's length but often in transactions between affiliates at prices designed to maximize the share at the top of the corporate pyramid. *See Duke Power Co. v. Federal Power Comm'n*, 130 U.S.App.D.C. 389, 393, 401 F.2d 930, 934 (1968). In many cases, therefore, the purchase prices—and, consequently, the rate bases—for utility properties were derived from book values reflecting the capitalization of hopes (more commonly characterized as "water"). Accordingly, corresponding to an approach taken by the Federal Communications Commission (FCC) a few years earlier in 1935, the FPC's new system divided utility property book values into three categories: (1) the "original cost" of the property to the first company that devoted it to public service; (2) an "acquisition adjustment" account reflecting the difference between the utility's own acquisition cost and the depreciated original cost of the property; and (3) any further appreciation reflected in "writeups" by the company over the sum of the first two categories. *Kripke, supra* at 436.

At the time these accounting rules were promulgated, utility companies were entitled to a financial return (called "fair value") computed on a rate base utilizing reproduction costs, which commonly combined all three of the FPC categories. *See, e. g., The Minnesota Rate Cases*, 230 U.S. 352, 454–55, 33 S.Ct. 729, 57 L.Ed. 1511 (1913); *Willcox v. Consolidated Gas Co.*, 212 U.S. 19, 41, 52, 29 S.Ct. 192, 53 L.Ed. 382 (1909); *Smyth v. Ames*, 169 U.S. 466, 546–47, 18 S.Ct. 418, 42 L.Ed. 819 (1898). Justice

Brandeis, however, dissenting in *Southwestern Bell Tel. Co. v. Public Serv. Com'n*, 262 U.S. 276, 289, 43 S.Ct. 544, 67 L.Ed. 981 (1923), had attacked the reproduction cost approach, arguing that investors should be entitled only to a return on the capital prudently invested in the enterprise, not on the appreciating value of the property acquired. Utility companies understandably feared, therefore, that the FPC's uniform accounting system, by segregating cost data, presaged an effort to contract each utility's rate base from reproduction costs to original cost.

The regulatory agencies sought to avoid judicial scrutiny of their new accounting systems by insisting that these systems would not be considered conclusive for ratemaking purposes. The Supreme Court accepted such assurances, holding in *American Tel. & Tel. Co. v. United States*, 299 U.S. 232, 57 S.Ct. 170, 81 L.Ed. 142 (1936), that FCC accounting did not violate due process because it merely was a system of notation, without substantive significance.[7] In reaching this conclusion, however, the Court was not oblivious to the powerful influence that the regulatory commissions' accounting systems inevitably would have on ratemaking. In fact, two years before the *American Tel. & Tel. Co.* decision, the Court already had recognized the significance of the accounting system for the rate structure. In *Lindheimer v. Illinois Bell Telephone Co.*, 292 U.S. 151, 54 S.Ct. 658, 78 L.Ed. 1182 (1934), the Court had held that annual depreciation charges were properly limited to computations based on original cost rather than reproduction cost. Greater charges for depreciation, the Court had said, would be tantamount to capital contributions. *Id.* at 169, 54 S.Ct. 658.

By the 1940s, the Supreme Court was ready to allow federal regulatory agencies to utilize the new accounting systems, as the utility companies had feared, to aban-

7. By 1950, the FPC could announce that the reclassification of accounts initiated by promulgation of the Uniform System of Accounts had been substantially completed. FPC, Report on Reclassification and Original Cost of Electric Plant of Public Utilities and Licensees (1950).

From the books of electric utilities alone, the FPC eventually ordered the removal of $1.6 billion in excess of the original costs of plants out of $8.4 billion previously recorded in utility plant accounts. FPC Annual Report (1965).

don the "fair value" doctrine of ratemaking. In the spirit of Justice Brandeis' dissent in *Southwestern Bell Tel. Co., supra,* the Supreme Court held that utility investors—while entitled to a fair rate of return on the historical cost attributable to their capital investment—have no constitutional entitlement to a return on the increased value, if any, represented by reproduction cost over original cost. *Federal Power Comm'n v. Hope Natural Gas Co., supra; Federal Power Comm'n v. Natural Gas Pipeline Co., supra.* Consequently, the FPC and state regulatory commissions received for the first time a green light for rate orders based solely on historical costs.

These cases, however, went further than mere justification of historical cost-based rates. Their principal significance lies in two broader departures from previous holdings: (1) the Court shifted away from a focus on particular property values and rates of return to a more general, limited concern about "the financial integrity of the company whose rates are being regulated." *Federal Power Comm'n v. Hope Natural Gas Co., supra,* 320 U.S. at 603, 64 S.Ct. 281, 288, and (2) the Court emphasized granting considerable deference to the expertise of a regulatory commission in arriving at a proper ratemaking judgment. As a constitutional matter, according to three concurring Justices,

[i]rrespective of what the return may be on "fair value," if the rate permits the company to operate successfully and to attract capital all questions as to "just and reasonable" are at an end so far as investor interest is concerned. Various routes to that end may be worked out by the expert administrators charged with the duty of regulation. It is not the function of the courts to prescribe what formula should be used. The fact that one may be fair to investors does not mean that another would be unfair. The decision in each case must turn on considerations of justness and fairness which cannot be cast into a legalistic formula. The rate of return to be allowed in any given case calls for a highly expert judgment. That judgment has been entrusted to the Commission. There it should rest. [*Federal Power Comm'n v. Natural Gas Pipeline Co., supra,* 315 U.S. at 607, 62 S.Ct. at 753 (Black, Douglas, and Murphy, JJ., concurring).]

The Supreme Court therefore, by the early 1940s, had shifted the utility investor's constitutional right from a just and reasonable rate of return based on current "fair value" of particular assets to a rate of return on an original cost rate base, with the particular rate being justified by the regulatory commission's expert view of the company's needs. A commission need only assure the "financial integrity" of the enterprise, including an ability to attract capital and compensate its investors for the risk assumed, even though the approved rate may "produce only a meager return on the so-called 'fair value' rate base." *Federal Power Comm'n v. Hope Natural Gas Co., supra,* 320 U.S. at 605, 64 S.Ct. at 289.

In facilitating this transition from the "fair value" to the "financial integrity" approach, the Uniform System of Accounts did not become a sacred premise for ratemaking. Although the System had provided the mechanism for accomplishing a rejection of the "fair value" doctrine, it was clear all along, as enunciated in *American Tel. & Tel. Co., supra,* that accounting decisions, as such, could not be considered determinative for ratemaking itself. *See United States v. New York Telephone Co.,* 326 U.S. 638, 653, 66 S.Ct. 393, 90 L.Ed. 371 (1946); *Colorado Interstate Gas Co. v. Federal Power Comm'n,* 324 U.S. 581, 608, 65 S.Ct. 829, 89 L.Ed. 1206 (1945); *Northwestern Electric Co. v. Federal Power Comm'n,* 321 U.S. 119, 125, 64 S.Ct. 451, 88 L.Ed. 596 (1944); *American Power & Light Co. v. Securities and Exchange Comm'n,* 158 F.2d 771 (1st Cir. 1946), *cert. denied,* 331 U.S. 827, 67 S.Ct. 1348, 91 L.Ed. 1842 (1947).

In our own jurisdiction, for example, there is significant precedent demonstrating that circumstances will dictate ratemaking judgments independent of the uniform accounting system. For example, in *Re D.C. Transit System, Inc.,* 30 P.U.R.3d 405,

*aff'd*, 110 U.S.App.D.C. 241, 292 F.2d 734 (1961), the Commission's predecessor, the District of Columbia Public Utilities Commission (PUC), abandoned the normal accounting treatment when D.C. Transit System, Inc. sold its Fourth Street shops and Southern carhouse to the Redevelopment Land Agency. If the $1.921 million of the sales proceeds attributable to depreciable property had been credited to the depreciation reserve, as required by the Uniform System of Accounts, that reserve would have swollen to 180% of the original cost of the properties. The PUC accordingly deviated from the accounting rules by allowing the company to credit to earned surplus the amount by which the proceeds attributable to the depreciable property exceeded the original cost.[8] The PUC noted:

> While fully cognizant of the desirability of adhering to the Uniform System of Accounts under normal conditions, we have never recognized the Uniform System of Accounts as an inflexible code from which departures in special or unusual circumstances would not be permitted when authorized by the commission. [*Id.* at 410.]

*See Democratic Central Committee I, supra* 158 U.S.App.D.C. at 40–41, 485 F.2d at 819–20. There have been instances where the FPC, too, has rejected strict application of the uniform accounting rules in ratemaking proceedings. *Manufacturers Light & Heat Co.*, 44 F.P.C. 314, 321–25, *rehearing denied*, 44 F.P.C. 1138 (1970) (contrary to uniform accounting rules, FPC granted "above the line" recognition of gains and losses in company's reacquisition of debt securities); *United Gas Pipe Line Co.*, 31 F.P.C. 1180, 1189 (1964) (contrary to uniform accounting rules, FPC allowed "above the line" treatment of reasonable charitable contributions as an operating expense).

It thus appears that there is no mandatory relationship between the Uniform System of Accounts and the Commission's ratemaking. We must therefore examine the details of the System to determine whether the Commission's per se reliance on it for ratemaking, as a matter of expert judgment, would appear, nonetheless, to be sound.

## B. *Details of the Uniform System of Accounts: Implications for Ratemaking*

A regulated company's balance sheet segregates the "utility plant" assets (including land), which are "used and useful" in serving the public, from the company's other assets—called "nonutility property"—which are carried on the books, most commonly, as investments. Suelflow, *supra* at 25–31.[9] Similarly, the company's income statement carefully separates "utility operating income" and related expenses from its "other income" arising out of activities beyond the Commission's jurisdiction. *Id.* at 20–25. Gains and losses on "utility" operations generally are allocated "above the line" to the ratepayers, whereas "nonutility" gains and losses are allocated "below the line" to the investors. *Id.* at 23–24. In a sense, therefore, each public utility is at least two companies: one serving and accountable to the public (through the good offices of the Commission) and the other accountable solely to its investors.

These allocations either to ratepayers or to investors are implemented on the company's books through use of accounts established under the Uniform System to reflect transactions with specified consequences above or below the line. Fundamentally, therefore, a utility's accounting system is designed to channel entries into accounting categories intended to have a prescribed impact on periodic ratemaking. *Id.* at 24.

---

**8.** Consistent with the Commission's position in the present case, the PUC agreed that the $.950 million profit on the sale of land was properly credited to earned surplus.

**9.** Utility plant assets (minus accrued depreciation) comprise the "rate base" on which the allowable rate of return is taken, whereas nonutility property is by definition placed outside the customers' obligation to provide a return. *See Telephone Users Ass'n v. Public Service Comm'n, supra*, 304 A.2d at 297, n.6.

When the Uniform System of Accounts is carefully examined, three characteristics having a bearing on this case became apparent. First, when property owned by a utility company is sold, the System does not generally favor either the shareholders or the ratepayers; the System allocates gains (or losses) to one group or the other, depending on specified circumstances. Second, there are a number of significant exceptions to the allocation principles themselves, making generalizations even more difficult. Third, the System calls for the exercise of substantial discretion by the regulatory commission in determining whether a particular transaction is better characterized one way or another under the System, often with significant consequences above or below the line. Given respondents' substantial reliance on this accounting System as a basis for ratemaking, it is crucial to understand the extent to which the System's fixed principles, subject to various exceptions, applied with the Commission's discretionary hand, can be said to provide a coherent defense to petitioners' assertions.

There is a threshold distinction in the System between utility property that is "operating" and "nonoperating." When a utility's "operating unit or system" is sold, the gain or loss [10] on both plant and land is allocated "below the line" to the shareholders—"[u]nless otherwise ordered by the Commission." [11] Usually, therefore, the only benefit to the ratepayers is removal of the residual book value of the facility from the rate base.

Whenever utility property becomes "nonoperating," however (*i. e.*, it is "retired" from active service rather than sold as an operating facility), the accounting becomes more complex—sometimes to the ratepayers' benefit. If the property is merely transferred out of the rate base but retained by the company as "nonutility" property, the ratepayers receive the benefit of removal from the rate base—the same benefit they would have received if the property instead had been sold as an operating unit. Account 121. Thereafter, if this "nonutility" property is sold, all gains or losses on both land and depreciable plant facilities accrue to the shareholders. Accounts 421.1 and 421.2; Plant Instr. 7.E., 10.1. If, on the other hand, nonoperating utility property is sold immediately upon its retirement, without prior transfer out of the rate base to a "nonutility" account, all proceeds allocable to the sale of land will accrue—gain or loss—to the shareholders; but, contrary to the results when "operating" or "nonutility" property is sold, all proceeds of the depreciable plant facility upon "retirement" will be allocated to the ratepayers. Account 108, Plant Instr. 10.B., 10.F. Thus, if the net "salvage" value of the electric or gas plant facility exceeds depreciated book costs, ratepayers will gain from the transaction. *But see Re D.C. Transit System, Inc., supra* (discussed in Part III.A., *supra*). Otherwise, of course, ratepayers will break even or lose.[12]

In summary, under the general accounting rules applicable to dispositions of land (in contrast with depreciable plant facilities), gains or losses are not credited or charged to the ratepayers under any circumstance. Whether land is sold as part of an operating unit, or sold immediately upon retirement from service, or sold after transfer to the status of "nonutility" property, the Uniform System of Accounts generally provides that the shareholders alone shall benefit from any gain—and bear any loss.

These general rules, however, are subject to a number of significant exceptions. For example, as an incentive for utility compa-

---

10. Gain or loss is derived from the sale price, less expenses, taken against depreciated book cost.

11. Plant Inst. 5.F., Uniform System of Accounts For Public Utilities and Licensees, (Class A and Class B), 18 C.F.R. Part 101 (1977); Plant Inst. 5.F., Uniform System of Accounts For Natural Gas Companies, 18 C.F.R. Part 201 (1977). These two systems applicable, respectively, to electric and gas companies are virtually identi-

cal and hereafter will be cited together solely as Definition ("Def."), General Instructions ("Gen. Instr."), Plant Instructions ("Plant Instr."), or "Accounts," as applicable.

12. "Salvage value" is defined as "the amount received for property retired, less any expenses incurred in connection with the sale or in preparing the property for sale." Def. 30. *See* Suelflow, *supra* at 92.

nies to acquire—indeed to stockpile—land (or to retain retired land) for "future use" as the need may arise, the Uniform System permits a utility company to add such land to the rate base, even though it may never be used in service. Account 105. There is, nevertheless, a *quid pro quo* for the ratepayers. Upon disposition of land held in this account, all gains (or losses) are allocated "above the line." Accounts 105, 411.6, 411.7. This approach reflects a policy that the ratepayers should underwrite the costs of long-range planning but, as a matter of equity, should receive all gains from dispositions of land held for use but never used. *See Accounting Treatment for Land Held for Future Utility Use and for Profits or Losses Realized Through Sales of Those Lands*, 45 F.P.C. 106 (1971).

Another exception pertains to unforeseeable "extraordinary losses on property abandoned or otherwise retired from service," Account 182, *i. e.,* losses (usually exceeding five percent of income) "which could not reasonably have been foreseen and provided for." *Id. See* Gen. Instr. 7. Normally, such losses would be borne by the shareholders in the sense that the normal depreciation chargeable to the ratepayers would not cover the loss as rapidly as the extraordinary loss provisions permit. In the Commission's discretion, however, they can be shifted to the ratepayers—which is likely to happen unless "the utility is earning a sufficient return and the company has ample time to recover fully the cost of plant through depreciation." *Suelflow, supra* at 73. See Account 182, Gen. Instr. 7.[13]

In simplified form, therefore, the accounting treatment which the Uniform System generally accords gains and losses on dispositions of utility property can be depicted as follows:

I. OPERATING UNIT
OR SYSTEM

[Gains or losses on plant facilities and land allocable to shareholders]

II. NONOPERATING FACILITY

| A. Depreciable (Plant) | B. Nondepreciable (Land) |
|---|---|
| 1. Sold upon retirement | 1. Sold upon retirement |
| [Gains or losses allocable to ratepayers] | [Gains or lossed allocable to shareholders] |
| 2. Transferred to "nonutility" property account; sold thereafter | 2. Transferred to "nonutility" property account; sold thereafter |
| [Elimination from rate base; gains or losses allocable to shareholders] | [Elimination from rate base; gains or losses allocable to shareholders] |
| 3. Sold after placement in "held for future use" account | 3. Sold after placement in "held for future use" account |
| [After elimination from rate base, gains or losses allocable to shareholders][14] | [After elimination from rate base, gains or losses allocable to ratepayers] |

13. "To be considered as extraordinary under *the above* guidelines, an item should be more than approximately 5 percent of income, computed before extraordinary items. . . . (See Accounts 434 and 435.)" [Gen. Instr. 7.]

14. In contrast with land "held for future use," it appears that gains and losses on depreciable utility plant assets carried in that same account are allocable to the shareholders. *See* Accounts 105, 411.6, 411.7, 421.1, 421.2, Plant

From this discussion it should be clear that respondents' defense on the basis of adherence to the Uniform System of Accounts may be question-begging, given the considerable room for Commission discretion in characterizing and approving particular accounting entries. For example, the determination as to whether a particular sale involves an "operating" or "retired" facility—which often is far from clear—may determine, as an accounting matter, whether the transaction shall be treated below or above the line.[15] Similarly, the Commission has discretion over inclusion and removal of land, especially retired land, in the "held for future use" account—a critical determination as to allocation of potential gains and losses to ratepayers or shareholders. The Commission, moreover, has discretion to determine whether retired property should—or should not—be transferred to a nonutility property account, with the consequent impact on rate base and eventual allocation of the proceeds upon sale. Finally, the allocation of an "extraordinary loss" to ratepayers or shareholders is discretionary.

This is not to say that reliance on the Uniform System as a basis for ratemaking is unjustified in the present case. Obviously, the System, which is designed to assist in ratemaking, reflects years of fine tuning premised on expert views about balancing investor and consumer interests. Moreover, many of the prescribed accounting treatments discussed above, subject to the Commission's discretionary gloss, are not relevant to this case. Despite these considerations, however, we must conclude that because of the substantial discretion of the Commission under the System, a defense of particular ratemaking based on per se application of that System says little more than "ratemaking based on expert Commission discretion." Thus, before we can draw a conclusion as to whether reliance on the Uniform System in this case provides a rational connection between the companies' land transactions and the Commission's decision to place them for ratemaking purposes "below the line," we have to examine the System very carefully as applied here.

## C.   The Uniform System of Accounts as Applied

█ The precise question is this: have petitioners made a "convincing showing" that the Commission's rate determinations are unreasonable, unjust, or discriminatory, D.C.Code 1973, § 43–301, because the decision in each case to allocate gains on particular dispositions of retired land exclusively to the investors is not rationally connected by "reliable, probative, and substantial evidence," D.C.Code 1977 Supp., § 1–1509(e), to the rate of return selected? Thus, we are asked to relate gains on *particular* land transactions to the Commission's determination of an overall *rate* of return—a complex inquiry.[16]

---

Instr. 7.E., 10.E. This different treatment of land and plant held in Account 105 appears to be anomalous. *Compare* Account 108, Plant Instr. 10.E., 10.F.

15. In 1973, the FPC withdrew from further consideration an earlier proposal to modify Plant Inst. 5.E. to provide "above the line" treatment of gains and losses on the sale of operating units or systems. Chairman Nassikas dissented, citing his belief that there commonly was abuse of discretion in characterizing facilities either as "operating" or "retired," in order to benefit investors over consumers. *Accounting Treatment to Account for Gains and Losses on the Disposition of Utility Property That Had Been Classified in Utility Service and Consolidation of Certain Depreciation Accounts*, 49

F.P.C. 390, 404 (1973) (Nassikas, Ch., dissenting.)

Our experience reveals that when losses occur ordinary retirement accounting is more likely to be followed, but when a gain is indicated the specialized accounting for sales of plant is elected. [*Id.* at 405.]

The Chairman illustrated his point:

The term "operating unit or system" has never been specifically defined by the Commission. A 10.14 mile section of pipeline (7 FPC 279) and a 7.586 mile section of a transmission line (32 FPC 1263) have been held to be operating units or systems. [*Id.* at 404 n.2]

16. If the gains on the land are deemed relevant to the ratemaking process, they would comprise one factor—a "land transactions" compo-

We must focus, of course, as much on the consumer interest as on the investor interest. According to the concurring Justices in *Natural Gas Pipeline*:

> The consumer interest cannot be disregarded in determining what is a "just and reasonable" rate. Conceivably, a return to the company of the cost of the service might not be "just and reasonable" to the public. [*Federal Power Comm'n v. Natural Gas Pipeline Co., supra* 315 U.S. at 607, 62 S.Ct. at 753 (Black, Douglas, and Murphy, JJ., concurring).]

With equal force, the United States Court of Appeals for the District of Columbia Circuit has stressed that "the end of public utility regulation has been recognized to be protection of consumers from exorbitant rates." *Washington Gas Light Co. v. Baker, supra* 88 U.S.App.D.C. at 119, 188 F.2d at 15 (footnote omitted). We therefore must examine how the Commission has accommodated consumer, as well as investor, interests in (1) selecting and (2) applying its ratemaking criteria. *See* Part II.A., *supra*.

1. The Commission announced generalized criteria for the WGL and Pepco rate determinations. As to WGL, the Commission recognized an "earnings slump" in recent years. Accordingly, the Commission saw a need for the company to have "an opportunity to regain a level of earnings needed to attract capital and to protect its financial integrity." (PSC Final Opinion and Order No. 5833, October 29, 1976, at 1–2.) The Commission tied the customers'

interest to WGL's financial health in two ways:

> [1] Since customers pay all the Company's capital costs, they gain by keeping those costs within prudent bounds. [2] Even more importantly, consumers have an overriding interest in continued service which rivals their interest in low rates. By aiding the Company to maintain financial stability, the Commission helps to insure high quality gas service. [*Id.* at 2.]

As to Pepco, the Commission noted that the company had "turned the economic corner" since prior proceedings. PSC Proposed Opinion and Order No. 5831, October 20, 1976, at 3. Thus, the Commission approached its decision.

> without the anxiety inherent in an attempt to rescue a floundering if not drowning utility, admittedly unable to save itself, but rather with the objective of affording Pepco an opportunity to achieve an appropriate degree of financial stability and to earn a just and reasonable rate of return, while at the same time assuring that the retail electric customers of Pepco in the District of Columbia will pay rates no higher than necessary to afford Pepco that opportunity. [*Id.* at 3–4.]

These criteria, while not overly precise, reflect the factors specifically approved by the Supreme Court. *See Permian Basin Area Rate Cases, supra* 390 U.S. at 791–92,

---

nent of a utility company's overall gain-loss situation—to be evaluated by the Commission as a long-run issue of ratemaking policy for the company. Thus if, for the sake of argument the Commission were to conclude that gains on land should be credited to the ratepayers, this does not necessarily mean that all the gains at issue here should be credited, dollar for dollar, to the customers' rate *payments*; nor does the conclusion suggest how land sales in the test year or earlier should be used to help forecast company revenues, as part of the rate-of-return calculation. The Commission, therefore, would have to deal with the following questions, among others: (1) To what extent, if at all, should the ratepayers' failure to challenge and

appeal allocation of these gains prior to the test year foreclose their receiving credit for the gains now, as an offset to scheduled rate payments? (2) To what extent do gains on land sales during the test year provide an appropriate—or distorted—basis for projecting gains into the future, as part of the company's projected revenues? Conceivably, after dealing with these and other questions, the Commission could conclude that the ratepayers are entitled to less credit than claimed for past transactions, and/or that calculation of the rate of return for the future should not reflect use of test-year figures alone for gains realized on land.

88 S.Ct. 1344 (quoted at note 4, *supra*). Moreover, the very contrast between the respective overall analysis of WGL and Pepco reflects an intention to balance investor and consumer interests very carefully in each company's situation. Finally, none of the parties has challenged the criteria, as articulated. We hold, therefore, that these criteria are acceptable.

2. We turn, therefore, to the question whether the particular elements of the rate orders satisfy the criteria selected.

The Commission has concluded, with respect to both companies, that the proper balancing of consumer and investor interests requires all gains (and losses) on ordinary transactions in land retired from service to be allocated to the investors. This decision is based on a conscious application of the Uniform System of Accounts to the ratemaking process, coupled with a specific conclusion that a contrary allocation policy would be ill advised because consumers, as a result, would be exposed to routine losses.

> If the Commission passes those gains to consumers, then it can no longer protect consumers from being charged with losses on land transactions which are routine. Once People's Counsel's proposal is adopted, as its witness acknowledged (Tr. 1080), the Commission should follow a rule compelling customers to underwrite the Company's property losses in ordinary circumstances. The Commission is not inclined to follow that path. [PSC Final

Opinion and Order No. 5833, Oct. 29, 1976, at 58 (WGL).]

·See PSC Proposed Opinion and Order No. 5831, Oct. 20, 1976, at 34–36 (Pepco); PSC Opinion and Order No. 5849, Dec. 16, 1976, at 9–10 (Pepco).

Petitioners counter with one principal argument: because the ratepayers have borne the "burdens" (*i. e.*, taxes and other carrying charges) of providing a "return" on the land while in the rate base, they are entitled to the "benefits" received upon sale, in accordance with principles announced by the United States Court of Appeals for the District of Columbia Circuit in similar litigation directed at the Washington Metropolitan Area Transit Commission ("WMATC").[17] *Democratic Central Committee I, supra; Bebchick v. Washington Metropolitan Area Transit Comm'n,* 158 U.S.App.D.C. 79, 485 F.2d 858 (1973); *Democratic Central Committee v. Washington Metropolitan Area Transit Comm'n,* 158 U.S.App.D.C. 107, 485 F.2d 886 (1973), *cert. denied,* 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974) ("*Democratic Central Committee II* ").[18]

In the *Democratic Central Committee* litigation, the circuit court overturned decisions by WMATC to credit the shareholders of D.C. Transit System, Inc. (Transit) with the capital gains accruing to Transit on its disposition of depreciable and non-depreciable properties acquired at a total price considerably below book value from Capital

---

17. In the WGL case, petitioners also argue that allocation of the contested gains to the shareholders is unreasonable and unjust because such treatment is inconsistent with the Commission's imposition of "extraordinary" losses on the ratepayers from the "Brandywine" property. Petitioners, however, do not challenge the Brandywine result itself—either the characterization of the losses as "extraordinary" (*see* Gen. Instr. 7) or the appropriateness of their allocation to the ratepayers. Nor do petitioners specifically advance a ratemaking principle that extraordinary losses and gains generally should be allocated to the same group, ratepay-

ers or shareholders. We therefore hold that the Commission's Brandywine decision is irrelevant to this proceeding; it does not in itself imply a particular result here. Petitioners are free, however, on remand to advance the Brandywine decision as evidence, to the extent it has probative value, on the broader question whether, under all the circumstances, allocation of the gains on land transactions to the shareholders is unreasonable and unjust.

18. These decisions are not binding on our court. *See M.A.P. v. Ryan,* D.C.App., 285 A.2d 310 (1971).

Transit Company (Capital) in 1959. Transit had acquired Capital's streetcar-bus system subject to a condition imposed by Congress, as part of the franchise award, that Transit convert the enterprise to an all-bus system throughout the metropolitan area. *Democratic Central Committee I, supra* 158 U.S. App.D.C. at 33, 485 F.2d at 812. This was to involve "removal of abandoned streetcar tracks and regrading and repaving of the abandoned track areas, at an estimated cost of $10,441,958 [footnotes omitted]." *Id.* The Commission authorized Transit to charge this cost of track removal, regrading, and repaving to its customers through adjustments in the rate structure while awarding all gains on disposition of nonoperating trolley facilities to Transit's shareholders—arguably amounting to an investor windfall in view of the acquisition price at considerably below book value.

Simply put, the circuit court concluded that the net result of these transactions, as approved by WMATC, was unfair to the ratepayers. In taking this position, the court stressed the windfall aspect.

> What the investors bought was an ongoing mass-transportation system with physical components, including the lands in question, long since dedicated to public service. We do not mean to imply that had that not been the case, value-appreciations would necessarily have been immune to claims of farepayers. We do say that since that was the case, it makes those appreciations more susceptible to those claims. [*Democratic Central Committee II, supra* 158 U.S.App.D.C. at 120, 485 F.2d at 899.]

The court thereupon distinguished the Transit situation from one in which "the properties [had] been originally purchased outright by Transit's investors with a view to deployment as they pleased." *Id.*

The windfall aspect—the peculiar equity—of the D.C. Transit situation is not apparent in the case before us; the *Democratic Central Committee* litigation is distinguishable as more egregious on the facts. Nor do other cases lend automatic support to petitioners' position. Litigation over allocation of gains on nondepreciable assets has been infrequent, although courts outside the District of Columbia generally have followed a "gain follows the risk of . . . loss" principle. *Democratic Central Committee I, supra* 158 U.S.App.D.C. at 19, 55–56, 485 F.2d at 798, 834–35. This has resulted, as the case may be, in allocation to the customers, *see, e. g., New York Water Service Corp. v. Public Service Comm'n,* 12 A.D.2d 122, 208 N.Y.S.2d 857 (1960), or to the shareholders, *see, e. g., City of Lexington v. Lexington Water Co.,* 458 S.W.2d 778 (Ky.1970). In the District of Columbia, there is no judicial precedent aside from the *Democratic Central Committee* litigation. (Prior to these circuit court decisions, administrative rulings by WMATC and the PUC had routinely allocated gains on nondepreciable asset to the investors. *See Democratic Central Committee I, supra,* 158 U.S.App.D.C. at 19–20, 55–56, 485 F.2d at 798–99, 834–35.)

It may be true, as petitioners argue—and as the circuit court indicated in *Democratic Central Committee I, supra* at 32, 485 F.2d at 811—that in an environment of steadily climbing land values, application of the "gain follows risk of loss" principle is not a meaningful test. But even so, petitioners, in relying on the supposed conclusiveness of the circuit court cases, have not carefully developed their own fundamental argument that the ratepayers, in bearing the "burdens" of taxes and other carrying charges on the land while in the rate base, have the superior claim to the "benefits" here. For example, they have not analyzed the relevance, if any, of the source of the capital for the land—investors or ratepayers.[19]

---

19. The facts showing who contributed the capital for acquiring the land have not been developed in the record, but a number of published decisions indicate that we cannot automatically assume the investors did so alone. The answer may be very complicated and thus difficult to find because of the following ratemaking history.

More important, they have not analyzed the likely impact of their proposed allocation on the financial strength of the company, including the market price of its stock.

Instead, petitioners argue a generality. [I]t is logically inconsistent to deny the shareholders the benefit of a market value rate base (by use of original cost as a rate base) and simultaneously to grant them the in-service appreciation of the rate base to market value. . . . If the shareholders in an original cost jurisdiction like the District of Columbia are not entitled to a *return* on the appreciation in value, then it is inconsistent to allow them to retain the *capitalized value* of this return (*i. e.,* the appreciation in value). [Petitioner WPIO's brief at 6; emphasis in original.]

The Commission's predecessor, the Public Utility Commission (PUC) of the District of Columbia, allowed the burden of the writedowns occasioned by plant reclassifications during the nineteen-thirties and -forties (*see* Part III.A., *supra* ) to be shifted substantially to the ratepayers, notwithstanding the PUC's adoption of the Uniform System of Accounts. In prescribing the Uniform System for Pepco and WGL, *see* Order No. 1559, PUC No. 3182, Dec. 31, 1936 (Pepco) and Order No. 1846, PUC No. 3197/1, Jan. 11, 1940 (WGL), the PUC did not order an abrupt transition; it required the System to be phased in over a long period of time. More particularly, the PUC conditioned application of the System on the continued use by Pepco and WGL of the "sliding scale" rate formula (sometimes referred to as the "Boston Sliding Scale"), which the PUC had promulgated earlier for these companies, *see* Order No. 1476, Feb. 5, 1936 (Pepco) and Order No. 1458, Dec. 13, 1935 (WGL), pursuant to a consent decree entered by the federal district court in 1924. *See Potomac Electric Power Co. v. Public Utilities Comm'n.,* 81 U.S.App.D.C. 225, 226–28, 158 F.2d 521, 522–24 (1946), *cert. denied,* 331 U.S. 816, 67 S.Ct. 1303, 91 L.Ed. 1834 (1947). In accordance with this formula, all newly acquired assets were to be valued at their original cost, but the assets held as of 1935—the year of a PUC property valuation— were to continue in the rate base at their reproduction cost (on which the 1935 valuation had been based). As a result, these reproduction cost elements were not to disappear from the rate base until the related assets themselves were retired from service. *See Washington Gas Light Co. v. Byrnes,* 78 U.S.App.D.C. 107, 108–09, 137 F.2d 547, 548–49 (1943), *aff'd,* 321 U.S. 489, 64 S.Ct. 731, 88 L.Ed. 883 (1944). Accordingly, petitioners here may have a demonstrable basis for the following argument:

This contention misses the mark. The Commission's ratemaking authority is not limited to wooden, symmetrical applications of standard criteria. Just as the gains on land outside the rate base are not inexorably awardable to the shareholders, they also are not inexorably assignable to the ratepayers simply because the land was once a part of the rate base.[20] The Commission, rightly or wrongly, has ordained the shareholders to be the more appropriate beneficiaries of the gains. Given the presumptive validity of the Commission's expert judgment in balancing investor and consumer interests, taken against petitioners' own incomplete analysis, we must conclude that petitioners have not made the "convincing showing" required to overturn a rate order. They cannot prevail at this time.

by continuing to pay on an inflated (though declining) rate base over a period of years, the ratepayers have provided rates of return consistently higher than those which the Commission had found to be just and reasonable. *Potomac Electric Power Co. v. Public Utilities Comm'n., supra,* 81 U.S.App.D.C. at 227, 158 F.2d at 523. Thus, the ratepayers, in effect, have paid the company for the appreciation of rate-base assets and/or acquisition of other property to be added to the rate base (through capitalization of excess earnings). It would follow that the ratepayers should benefit from the gains on sale of property in which they, in this manner, invested; the company should not be paid twice.

This argument, however, is far from conclusive. It has not been developed in the record, including evidence as to how the 1935 cost data is traceable, if at all, to the values of the properties involved in the land transactions here. Yet, on the basis of published PUC orders, there is some evidence that Pepco's and WGL's ratepayers may have an equitable claim (based on *de facto* capital contributions) to a portion of the land values at issue. Obviously, the claim is more elusive, less dramatic, and spread back further over time than the ratepayers' equitable assertions in the *Democratic Central Committee* cases, but the claim, nevertheless, appears theoretically available—unless overshadowed, on the ground of staleness, by more recent, valid investor expectation.

**20.** If the Commission were to prevail, petitioners presumably would oppose the logic of increasing the rate base to reflect the current value of nondepreciable assets used in service to the public.

3. It does not follow, however, that the rate orders are valid. Petitioners' argument is not frivolous; it is a plausible thesis, as the *Democratic Central Committee* litigation attests. Petitioners' failure to come to grips with the issue may be due to the ultimate invalidity of their position; but it may be due, instead, to the utility companies' failure to develop the administrative record sufficiently to support the Commission's order with respect to the land gains issue, or to the Commission's failure to draw upon the record in a way that sufficiently supports its land gains conclusion. Thus, as indicated in Part II, *supra,* we have a responsibility to hold the Commission accountable for explaining its actions fully and clearly, based on substantial evidence of record. Accordingly, respondents are obligated to come forward with evidence confirming that the Commission's decision to allocate all gains to the shareholders on the particular dispositions of retired land at issue are rationally connected by "reliable, probative, and substantial evidence" to the rates of return selected. It is therefore important, finally, to consider whether the Commission has done a complete enough job.

The Commission has arrived at 9.25% and 9.06% overall rates of return for WGL and Pepco, respectively. The methodology is said to be a discounted cash flow (DCF) analysis based on a comparison of WGL and Pepco securities, respectively, with those of other utility companies in the same categories of risk. More particularly, the Commission evaluated, with the help of such comparison, what current dividend yield per share, coupled with an expected growth in dividend, would be required to maintain each company's common stock price at or slightly above book value. (According to the Commission, this is the yield, including growth, minimally required to assure the company's financial integrity while keeping faith with the consumers' right to "no higher" than a just and reasonable rate of return.) The Commission then combined this figure with weighted averaging of essential rates of return on preferred stock, long-term debt, and (for WGL) customer deposits to determine each company's overall rate of return.[21] Once this overall rate was calculated, the Commission applied it to each company's rate base in the test year to determine overall utility revenues. Finally, since the existing customer rate schedule would not yield these essential revenues, the Commission approved a rate increase to the level required for each company to achieve the established overall rate of return (on the rate-base assets). It is necessary to analyze, therefore, how the capital gains on land are reflected—if at all—in this process.

We begin by noting that the price of a utility company's common stock reflects the financial return on both utility and nonutility operations (if any); thus, the Commission's DCF methodology presupposes that WGL's or Pepco's nonutility transactions will bring, on the average, virtually the same rate of return as the utility side of the business. Otherwise, depending on their magnitude, the company's nonutility transactions are likely to affect the dividend yield per common share (and thus the stock price), up or down, compared to the yield (and price) premised on the Commission-approved rate of return. For example, one result of different rates of return on a

---

**21.** The result for WGL was a projected 13.4% return on common equity, a figure which took into account that "the company's price per share has fallen below book value." When this 13.4% return was combined through weighted averaging with essential rates of return on preferred stock (6.5%), long term debt (7.1%), and customer deposits (6.0%), the overall rate level became 9.25%.

Similarly, the Pepco overall rate-of-return level became 9.06% based on weighted averag-

ing of projected returns from equity (13.00%), preferred stock (7.87%), and debt (6.92%). Apparently, all parties to the Commission proceeding agreed that the "market price should exceed book" value; the "companies selected as comparable to Pepco have experienced a substantially lower return on equity than that recommended by Pepco witnesses, but have nevertheless achieved a market to book rate of approximately 1.3."

company's utility and nonutility operations might be that nonutility revenues, when coupled with earnings derived from the approved utility rate of return, would produce a higher total return to investors from all the company's operations than the Commission had deemed necessary to maintain the price of common stock at the appropriate level. Alternatively, of course, nonutility transactions might be a drag on the company, causing a lower overall rate of return than the Commission had thought essential to sustain investor interest. We therefore have to consider what bearing, if any, a company's nonutility transactions have on ratemaking—especially transactions involving nonutility property, such as the lands at issue here, that were formerly part of the rate base.

The Federal Power Commission has taken the position that ratepayers have no right to revenues derived from nonutility operations. *Re Duke Power Co.,* 97 P.U.R.3d 396 (1972) (disallowed discovery into transactions of a utility company's land and lumber company subsidiary). Even if true, however, that principle does not reach a fundamental question in the present case: to what extent do earnings from nonutility transactions affect the stock price? Without an answer to that question, a regulatory commission will not have enough data to determine how much revenue should be generated from the utility side of the business to cover its share of maintaining the common stock.

More particularly, apropos of *Duke Power,* if the company had a booming nonutility operation, such as a lumber company, in contrast with a struggling utility division, a regulatory commission might be acting capriciously if it permitted utility revenues to remain so low that the nonutility side—the investors—were substantially subsidizing the utility customers, especially when the customers had contributed nothing to the nonutility assets. That would raise a fundamental question about the Commission's reaching beyond its jurisdiction over utility operations. On the other hand, let us assume a transfer of property out of the rate base to the nonutility side, resulting (after eventual sale) in substantial capital gains to the company based on appreciation while in the rate base—as in the present case. Assume, further, that these gains alone are responsible for a higher market price of the stock than the price deemed essential by the Commission (based on comparisons with other utility stocks) to attract investors and thus maintain the company's financial integrity. Arguably, then, the customers could have an equitable claim to those gains, depending on factors such as contributions to taxes, carrying charges, and capital for the land. Another relevant factor might be risk of loss while the land was in the rate base, perhaps discounted by how real—or unreal—that risk was when compared with the prospect for gain.[22] Given such equitable considerations, therefore, the fact that the Commission had permitted the company to transfer the land to a nonutility account before sale would not be determinative of the Commission's jurisdiction to consider the gains on that land for ratemaking purposes.[23]

There is no indication in the record that the Commission, in determining the essential rates of return for WGL and Pepco, actually considered the impact of land transactions on the price of either company's common stock. We therefore confront an unanswered question: was the Commis-

---

22. "It would be little more than an exercise in abstract logic to invoke the principle of gain-follows-loss where the financial risk is wholly illusory." *Democratic Central Committee I, supra,* 158 U.S.App.D.C. at 32, 485 F.2d at 811.

23. In this connection, assume that the lands were still in the rate base at the time of sale as part of an ordinary retirement of a nonoperating facility. Under the Uniform System of Accounts, the gains would be allocable to the shareholders, just as they are after the property has been transferred to a nonutility account. *See* Part III.B., *supra.* According to our analysis in the text above, however, the allocation of such gains must be legally justified on an ad hoc basis (as an explicit part of the DCF analysis or other methodology) not merely by reference to the uniform accounting system.

sion's allocation of the gains to the share-holders related to its announced criteria stressing protection of the companies' financial integrity; or, instead, was it attributable to a normative judgment that the shareholders alone, as owners, have a "right" to the gains?

It may be, apropos of the first alternative, that the Commission, in rethinking the rate structure with reference to company land transactions, would conclude that investors over the years have expected—and should continue to expect—that ordinary gains on land retired from service will inure to their benefit, and that these expectations have been reflected in the price of stock, with a consequent impact on the companies' ability to attract capital. If this is the case—*i. e.,* if the appreciation accruing on nondepreciable property in the utility's rate base has been fully capitalized into the stock price—then the Commission may conclude that these gains already have inured to the benefit of ratepayers in the sense that the stock price, and thus the company's earnings (including customer payments), are at the lowest justifiable level. On the other hand, in facing the question squarely, the Commission may conclude that investors have not had—or in the future should not have—reason to anticipate that they will receive all gains which accrue on nondepreciable property during the period while in the rate base. In that case, the stock price would not reflect allocation of the gains on land to the investors, and the Commission would be faced with essentially an equitable question: whether there exists a justification for the investors to receive the benefit of capital appreciation of rate-base assets, in excess of the return necessary to assure the company's financial integrity, without giving any corresponding benefit to the ratepayers.

We are not willing to speculate on what the Commission's position may be on these questions, absent evidence in the record that they have been explicitly and substantially addressed. However, two implications of such an inquiry by the Commission should be stressed to guide future consideration. First, equitable principles commonly used in utility-rate cases, such as "benefits follow burdens" or "gain follows risk of loss," would be irrelevant if the Commission's DCF analysis were to show that the minimum essential price of common stock presupposes an allocation of all capital gains on land to the shareholders. That is to say, if the Commission were to conclude that allocation of the gains on the land to the ratepayers, rather than the shareholders, would cause a drop in stock price below the minimum level required to attract investors, then such allocation to the ratepayers would be meaningless, for there would have to be an offsetting increase in the rate of return to maintain the stock price. Second, if the Commission's DCF analysis were to show, to the contrary, that allocation of the gains to the shareholders would boost the stock price above the required minimum, or that allocation of the gains to either group, shareholders or ratepayers, could not be shown to affect the stock price, up or down, then the Commission would have to deal more directly with all the equitable factors under the controlling mandate of *Natural Gas Pipeline, supra,* and *Hope Natural Gas, supra,* namely that the company's "financial integrity" is all the Commission is obliged to guarantee the investors. Whether the Commission is permitted to guarantee the investors more, given the statutory standard requiring just and reasonable rates, is a question that is not now before us.

■ In summary, the Commission has not yet explained its financial analysis connecting the disputed land transactions to its rate orders. The Commission has merely quoted from a 1975 rate determination where, in response to WPIO's raising the same issue, the Commission did no more than distinguish the *Democratic Central Committee* cases on their facts and issue the following conclusional—but not at all conclusive—statement:

> Treatment in accordance with the company's handling of this matter is in accordance with the FPC Uniform System of Accounts which this Commission has

adopted, thereby establishing its policy on this issue. An ex post facto change in this policy would be inappropriate. [*Re Potomac Electric Power Co.,* 11 P.U.R.4th 215, 237 (PSC D.C.1975).]

See PSC Proposed Opinion and Order No. 5831, Oct. 20, 1976, at 34–36. The Commission in the present cases, therefore, has not advanced affirmative, particularized reasons justifying its treatment of the capital gains on land. Unless and until the Commission does so, reflecting attention to the consumer as well as investor interest, we cannot say that the Pepco and WGL rates at issue here have been established on the basis of "reliable, probative, and substantial evidence." D.C.Code 1978 Supp., § 1–1509(e).

■ Accordingly we hold that when a regulatory commission calculates and approves an overall rate of return (and consequent rate schedule) for utility operations, based on comparative stock prices, it must factor into its determination an analysis of the impact of nonutility transactions on the price of the company's stock, including specific findings and conclusions as to whether—and why—the investors, the ratepayers, or both, have a claim to nonutility revenues, especially those derived from former utility property (such as the land at issue here) which appreciated while in the rate base. Mere reference to the Uniform System of Accounts begs the question; it will not suffice.

### IV. Conclusion

In *S. E. C. v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), the Supreme Court articulated our central point as follows:

The Commission's action cannot be upheld merely because findings might have been made and considerations disclosed which would justify its order as an appropriate safeguard for the interests protect-

ed by the Act. . . . For the courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review. . . . [T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained. [*Id.* at 94, 63 S.Ct. at 462.]

We therefore remand the proceedings for clarification, pursuant to our authority under D.C.Code 1973, § 43–705.[24]

We direct the Commission to issue supplementary findings and conclusions, consistent with this opinion, supporting the present or revised rate orders. The Commission may, in its discretion, rely on the present record or reopen the record for receipt of supplementary evidence and supporting papers by all parties. The Commission, in any event, shall give all parties an opportunity to comment on its proposed findings, conclusions, and orders before the Commission deems them final for our further review. The Commission's findings, conclusions, and orders shall be filed with this court, accompanied by supporting decisions or memoranda and the records of the proceedings on remand. Within 30 days of that filing with the court, the petitioners and intervenors shall file their responses, after which this court will either set the matter for hearing or proceed directly to make its decision.

On one point we hope to be especially clear. By holding that the Commission's orders are not supported by substantial evidence, we are not suggesting that petitioners are—or are not—likely to prevail. We merely are holding that petitioners have presented a challenge that requires a satisfactory answer, and that to date the Commission, in failing to respond with particularity, has not sufficiently connected its decisions on the allocations of gains on land to

---

**24.** The court "may require and direct the Commission to receive additional evidence upon any subject related to the issues on said appeal concerning which evidence was improperly excluded in the hearing before the Commission or upon which the record may contain no substan-

tial evidence." D.C.Code 1973, § 43–705. Implicitly, under § 43–705 the court, prior to concluding its hearing of the appeal, also may require clarification of the Commission's findings and conclusions short of reopening the record for additional evidence.

its determinations of particular rates of return.

Our position is better expressed in the following words of Judge Prettyman:

This court, in the present case, has not reversed the conclusions of the Commission, except in the procedural sense necessary to a remand. It has remanded the case for clarification where clarity is not present, and for completion where incompleteness now exists. When the findings and conclusions are complete and clear, the court will then, if appropriate proceedings are brought, consider whether the ultimate rulings of the Commission are within the permissible bounds of its power. [*Mississippi River Fuel Corp. v. Federal Power Comm'n,* 82 U.S.App.D.C. 208, 227, 163 F.2d 433, 452 (1947).]

*Remanded for further proceedings.*

NEBEKER, Associate Judge:

It has been and remains my intention to dissent from the majority's disposition of this case, principally because of my conviction that the majority sorely misconceives our proper review role in cases of this nature.

The question of the scope of our review is among the issues which now are pending before the court en banc in *Potomac Electric Power Co. v. Public Service Commission,* No. 10490, D.C.App., 380 A.2d 126. It is my belief that we should not dispose of this case until the en banc case has been resolved. The majority, nonetheless, has elected to publish its opinion before the preparation of my dissent. It does so under Part VII, Paragraph G, of our new Internal Operating Procedures (from the adoption of which I dissent).

I shall write and release my dissent in this case as soon as feasible after the court's resolution of the en banc proceeding in No. 10490.